UNITED STATES, Appellee,

v.

John WHEELWRIGHT,
Defendant, Appellant.

No. 90–1304.

United States Court of Appeals,
First Circuit.

Heard Sept. 6, 1990.
Decided Oct. 18, 1990.

Dana Alan Curhan, New Bedford, Mass.,
with whom Barry M. Haight and Buckley,
Haight, Muldoon, Jubinville & Gilligan, Mil-
ton, Mass., were on brief, for defendant,
appellant.

Carolyn Stafford Stein, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., was on brief, for appellee.

Before BREYER, Chief Judge, VAN GRAAFEILAND,* Senior Circuit Judge, and TORRUELLA, Circuit Judge.

BREYER, Chief Judge.

A jury found John Wheelwright (a previously convicted felon) guilty of unlawfully possessing firearms (1) on November 6, 1987, (2) on September 25, 1988, and (3) on August 3, 1989. 18 U.S.C. § 922(g)(1). The district court, applying the Federal Sentencing Guidelines to these convictions, determined that Wheelwright's "offense level" was 17, his criminal history category was III, and the Guidelines therefore called for imprisonment of 30 to 37 months. The court imposed a sentence of 37 months imprisonment and a $50,000 fine. On this appeal, Wheelwright claims the court made various Guideline-related sentencing errors. We have found no legal error. We affirm the district court's judgment. We shall discuss each of appellant's arguments in turn.

■ 1. *Drug Offense Cross Reference (1987).* We turn first to appellant's unlawful gun possession in November 1987. The district court correctly found the applicable United States Sentencing Guideline (hereinafter, U.S.S.G.) to be the 1987 version of § 2K2.1 entitled "Receipt, Possession, or Transportation of Firearms and Other Weapons by Prohibited Persons." That guideline set forth an offense level of 9. U.S.S.G. § 2K2.1(a). Subsection (c)(1) of that guideline, however, said that if "the defendant used the firearm in committing or attempting another offense," the court should "apply" the guideline applicable to that other offense where doing so would lead to a higher offense level.

The district court determined that the defendant unlawfully "used" the guns in "committing or attempting" a drug offense, namely the offense of possessing less than 25 grams of cocaine with the intent to distribute it. The relevant drug

offense guideline sets forth a level of "12" for a person who possesses (with intent to distribute) less than 25 grams of cocaine, and it adds two levels where a gun is possessed during commission of the drug offense. U.S.S.G. § 2D1.1(b)(1). Since the resulting drug offense level (14) was greater than the basic firearm offense level (9) the court used the number "14" not "9" in calculating Wheelwright's ultimate offense level. (Between the time the defendant committed the offense and the time of sentencing, the Guidelines were revised, but the revisions, such as those that increase punishment for the firearms offense, either do not apply to the defendant, or do not significantly affect this case.)

Wheelwright challenges the court's decision to use the drug offense guideline. He claims that the firearm guideline's cross reference language does not apply to him because he did not "use" the guns "in committing or attempting" drug offenses. The record shows, however, that, on the relevant date, November 6, 1987, police officers, searching his house with a warrant, found three plastic freezer bags with cocaine residue, a scale of a type used for drug transactions, a magazine folded in a special way used for drug sales, some marijuana, inositol powder (often used to dilute pure cocaine), $25,000 cash in a couch, and $9,000 cash elsewhere in the house. They also found a loaded shotgun at the foot of the stairs and a loaded rifle, which the appellant was shooting when they entered. The district court obviously believed that those who have drug-related material of this sort in their houses likely sell or distribute drugs, and that drug distributors who have loaded guns nearby are likely to use the guns in "committing or attempting" drug offenses. We see nothing unreasonable about these beliefs. And, we cannot say that a finding that the guns were used to commit drug offenses, based upon strong evidence of drug distribution and readily accessible loaded guns, is "clearly erroneous." *United States v. Paulino,* 887 F.2d 358, 359 (1st Cir.1989) (appeals court reviews such fact-based determina-

---

* Of the Second Circuit, sitting by designation.

tions under a "clearly erroneous" standard); *United States v. Wright*, 873 F.2d 437, 443–44 (1st Cir.1989) (same); *United States v. Bronaugh*, 895 F.2d 247, 251 (6th Cir.1990) (applying clearly erroneous standard to factual determination triggering cross reference provision U.S.S.G. § 2K2.1(c)).

The appellant adds that even if the court was right to apply the drug guideline, it should not have added two levels for possession of the guns. *See* U.S.S.G. § 2D1.1(b)(1). The language of the firearm guideline cross reference makes clear, however, that the court is to apply the cross-referenced drug *"guideline"* which includes that guideline's upward adjustment for having guns. U.S.S.G. § 2K2.1(c)(1). We concede that the italicized word appears only in the 1987 version of the Guidelines; that the sentencing court, where the Constitution's ex post facto clause permits, is normally to apply the version of the Guidelines in effect at the time of sentencing, *see* 18 U.S.C. § 3553(a)(4); and that the newer 1989 Guidelines were in effect when appellant was sentenced. But, this fact does not help appellant. The more recent 1989 version of § 2K2.1(c) adds an additional cross-reference to § 2X1.1 (which then cross-references back to the drug guideline, § 2D1.1) which explicitly states that the court is to apply both the drug guideline's "base offense level" and any "adjustments," such as the gun adjustment, that can be "established with reasonable certainty." U.S.S.G. § 2X1.1(a). While the cross-references are linguistically complex, the policy they embody is simple: The punishment for a defendant who unlawfully possesses both guns and (related) drugs is to reflect both the guns and the drugs.

2. *Drug Offense Cross Reference (1988)*. The appellant repeats the two arguments just discussed in respect to his unlawful possession of guns in 1988. But, the 1988 evidence is very much like the 1987 evidence. Police officers searched appellant's house. They found two plastic bags with cocaine residue, a different kind of scale used to weigh drugs, a jar of inositol, and $16,000 cash. They also found three firearms, including a loaded shotgun readily accessible in a hallway. Again, we cannot say that the district court was "clearly erroneous" in concluding (on the basis of this evidence) that the guns were used in "committing or attempting" drug offenses.

3. *Obstruction of Justice*. Guideline § 3C1.1 instructs the sentencing court to add two offense levels if "the defendant willfully impeded or obstructed ... justice during the investigation or prosecution" of the offense. The district court, applying this guideline, added two additional levels to the drug guideline's 14 levels because, in its view, the appellant obstructed justice by intimidating a witness, Norman McKinnon. McKinnon provided the state police with information that led to their initial November 1987 search of appellant's home. Soon after McKinnon did so, several men (whom McKinnon would not name) beat him badly. Subsequently, he received threats, usually just before he was scheduled to appear as a witness in a court proceeding against the appellant, and he was beaten on two other occasions just before he was supposed to testify. Appellant argues that this evidence does not show that he was behind the threats and beatings. In our view, however, the timing and the pattern of the threats and the beatings would permit a sentencing court to find "by a preponderance of the evidence," *United States v. Wright*, 873 F.2d at 441, that appellant was involved. That is to say, we cannot say that the district court's finding is "clearly erroneous." *See United States v. Brown*, 900 F.2d 1098, 1103 (7th Cir.1990) (reviewing finding that defendant had obstructed justice under clearly erroneous standard); *United States v. Christman*, 894 F.2d 339, 342 (9th Cir.1990) (same).

In reaching this conclusion we have taken account of appellant's claim that the district court should not have believed McKinnon's testimony. But, matters of credibility are normally for the trial court, not this court, to decide. *Scarpa v. Murphy*, 806 F.2d 326 (1st Cir.1986). In any event, McKinnon's story is not inherently incredible. And, it was corroborated by a

police officer who himself saw rope burns on McKinnon's face.

We have also noticed that the application notes to the 1987 obstruction guideline say that "suspect testimony and statements should be evaluated in a light most favorable to the defendant." U.S.S.G. § 3C1.1, comment. (n.2). We think the statement most likely refers, not to "suspicious" testimony, but rather to testimony given by a "suspect," *i.e.*, by the defendant himself in court under circumstances where a judge might (after conviction) find it tempting to impose an "obstruction" increase on the ground that the defendant had lied on the witness stand. The statement may caution the courts to give the defendant the benefit of the doubt in such circumstances. If that is what it means, the statement is inapplicable here. Even if the statement means that "suspicious" testimony should be interpreted in defendant's favor, we would reach the same result. Whether or not testimony was "suspicious" would be a matter for the district court in the first instance. And, we cannot say that the district court had to find McKinnon's testimony "suspicious" enough to require a different result. (We note that the Sentencing Commission in its 1990 Guidelines has removed the statement from the commentary to § 3C1.1.)

■ 4. *Acceptance of Responsibility*. The appellant says that the district court should have deducted two levels because he "accepted responsibility" for his conduct. U.S.S.G. § 3E1.1. A comment to the "acceptance of responsibility" guideline says, however, that conduct warranting an upward adjustment for obstruction of justice "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. § 3E1.1, comment. (n.4). Moreover, it is primarily up to the district court to decide whether or not the appellant accepted responsibility for his conduct "with candor and authentic remorse." *See United States v. Royer*, 895 F.2d 28, 30 (1st Cir.1990); U.S.S.G. § 3E1.1, comment. (n.5) ("sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility"). The

district court need not have given the appellant the benefit of this adjustment.

■ 5. *Multiple Counts*. The "multiple counts" section of the Guidelines, U.S. S.G. §§ 3D1.1–3D1.5, contains a complex set of rules designed to produce results consistent with two widely shared intuitions about punishing a person convicted of several different counts of criminal behavior (intuitions that pre-Guidelines sentencing practice reflected). The first intuition is that a person who engages in several different criminal acts, say, six bank robberies or six assaults or the sale of six hundred grams of cocaine, should be punished more severely than a person who participates in only one such act, say, one bank robbery or one assault or the sale of one hundred grams of cocaine. The second intuition is that the total punishment (where the person is convicted of several such acts at one time) normally should be less than simple addition of the punishment for committing each offense separately. Pre-guideline punishment practice indicated that a person who assaults six victims (say, in a street brawl) would be punished more severely than a person who assaulted only one victim, but *not six times* more severely; a person who robbed six banks would be punished more severely than a person who robbed one bank, but *not six times* more severely; a person who sold six hundred grams of cocaine would be punished more severely than a person who sold one hundred grams, but *not six times* more severely.

The "multiple count" guidelines seek to embody this pre-Guidelines practice in two basic ways. First, they take all counts involving "fungible items," such as crimes involving drugs or simply money, place them in a single group, and apply the relevant sentencing guideline to the *total* amount of drugs or money in the group. *See* U.S.S.G. § 3D1.2. Since the drug guidelines and the relevant money (*e.g.*, fraud or theft) guidelines typically have tables that (a) increase punishment as amounts increase, but (b) increase the punishment *less* than proportionately, the guidelines yield a punishment consistent

with the two basic intuitions. *See, e.g.,* U.S.S.G. § 2D1.1.

Second, the Guidelines take counts involving other ("non-fungible-item") crimes and place those that involve essentially the same (or closely related) criminal events in a single group. They then assign a "unit" to each group, and they instruct the judge to add up the units. The Guidelines add extra offense levels for additional units. The tables that do this are constructed so that the Guidelines (a) increase punishment as the number of separate criminal events increases, but (b) increase punishment less than proportionately. *See* U.S.S.G. § 3D1.4. They thereby yield a punishment consistent with the two basic intuitions.

To be more specific, the multiple count guidelines define which of several convictions under a multiple count indictment the court should place in a single group. The rules then tell the court to assign to the group either (a) the highest level of any of the offenses that comprise it, or (b) the level associated with the sum of the fungible items (*e.g.,* drugs or money). Finally, if there is more than one group, the rules assign units, add them up, and associate the total with additional offense levels. (The Guidelines' "multiple count" system is more complex than indicated in this somewhat simplified explanation of the intuitive ideas that underlie it.)

The district court in this case followed the multiple count rules. It decided that the first two counts—the 1987 and 1988 firearm possession counts—belonged to a single group. In doing so, it applied one of the rules for grouping counts, a rule contained in U.S.S.G. § 3D1.2(d). That rule says, in relevant part, that

[c]ounts are grouped together if the offense level is determined largely on the basis of ... the quantity of a substance involved ...

Because of the cross reference to the drug guideline, the offense level for each of the first two counts was "determined largely on the basis of ... the quantity" of the drugs found together with the guns. The Guidelines go on to instruct the court, in determining the offense level that applies to this single "group," to use the offense level "corresponding to the aggregated quantity" of drugs. U.S.S.G. § 3D1.3(b). Because the amount of drugs involved in both 1987 and 1988 when added together was so small (only residues were involved), the offense level the drug guideline applied to the "aggregate" was exactly the same as the offense level it applied to the 1987 and 1988 offenses considered separately. Therefore, grouping the offenses together and considering the "aggregate" amount did not change the offense level.

The court did not place the third offense, the 1989 offense, in the same "group" as the first two because the third offense was a separate offense the punishment for which was not "determined largely on the basis of ... quantity." U.S.S.G. § 3D1.2(d). It therefore constituted a different "group." The court, following detailed instructions contained in Guideline 3D1.4, assigned one unit to the first "group," one half unit to the second group, and, on the basis of a table, increased the offense level by one level, producing a total level of 17, instead of 16. (The Guidelines assign only half a unit, rather than a whole unit, when one "group" involves crimes that are much less serious than those involved in another group so that, for example, the punishment for a kidnapper who also embezzles $50 will be somewhat less than that for a kidnapper who also attempts a murder.)

Appellant argues that the district court should not have added this single extra level. He says that to do so creates an anomaly: If the police had found drugs in the house in 1989, as they did in 1987 and 1988, the third count would have belonged in the same single group as the other two, and his punishment would not have increased. He says that his punishment has increased only because his crime was *less* serious, in that he possessed the firearm alone.

The answer to the appellant's argument is that the district court properly applied the Guidelines as they are written. There is no guideline that would place the 1989 firearm possession in the same "group" as

the other two. We recognize that in addition to the "fungible substance" guideline, which we have already mentioned, Guideline 3D1.2(b) says that two counts should be placed in the same group when they

> involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan ...

But, this latter guideline does not help appellant. That is because the record shows significant differences between the third count and the other two. In 1987 Plymouth police officers found guns and drugs in appellant's Plymouth home and arrested him. In 1988 Plymouth police officers again found drugs and guns in the same Plymouth home and arrested him again. But, in 1989, different officers (federal firearms agents) found a different kind of gun (a .22 caliber rifle), without drugs, in a different home, in a different town (Kingston, Massachusetts). The differences in place, time, nature of the guns, lack of drugs, and intervening arrests, in our view, when taken together, permitted the district court to conclude that the third offense did not share a "common criminal objective" with the first two offenses nor was it part of the ("fungible substance") common "scheme or plan."

We further recognize that yet a different guideline, U.S.S.G. § 3D1.2(d), places counts in a single group (in certain instances) "if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." For the reasons just mentioned, however, we believe the district court could properly conclude that the "behavior" in question was not "ongoing or continuous." We are not aware of any other guideline that, even arguably, would place the third count in the same "group" as the other two.

Appellant notes that, in commentary to the "multiple count" guideline, the Commission recognized that the somewhat mechanical nature of the rules could sometimes produce sentences that were inadequate or excessive, which "can be handled through departure." U.S.S.G. § 3D1.4, comment. (backg'd). And, he adds, the

court should have departed here to avoid the "anomaly" that he has mentioned. We have held, however, that, in the absence of extraordinary circumstances, we shall not review a district court's decision *not* to depart from the Guidelines. *See United States v. Ocasio*, 914 F.2d 330, 330 (1st Cir.1990); *United States v. Ruiz*, 905 F.2d 499, 508–09 (1st Cir.1990) ("absent extraordinary circumstances, a criminal defendant cannot ground an appeal on the district court's discretionary decision not to undertake a downward departure from the sentencing [guidelines]").

In any event, it is not clear that an "anomaly" exists. The drug guideline bases its punishment primarily upon the amount of drugs found. If drugs had been found along with the gun in 1989, the 1989 offense would have been added to the first group. Whether doing so would have produced a punishment less than, equal to, or greater than, the punishment the appellant actually received depends upon *the amount* of drugs that (hypothetically) would have been found in 1989. Of course, in both 1987 and 1988, only residues of cocaine were found. Adding one "residue" to another did not significantly increase the amount of drugs involved. Hence grouping the 1987 and 1988 offenses together did not increase the punishment. Similarly, if only a residue had been found in 1989, grouping would have helped the appellant. But, one might consider the "anomaly" in this situation to be the drug guideline's near total reliance upon amounts—in the fact that finding several "residues" on several different occasions did not increase punishment. If so, appellant benefited from the anomaly when the first two counts were grouped. The guidelines did not treat him unreasonably in increasing the punishment one level in light of the fact that, on a third occasion, police found another gun unlawfully in his possession. The district court could readily conclude, therefore, that no departure was necessary.

■ 6. *The Fine.* The district court imposed a fine of $50,000, the maximum fine that the Guidelines permit at his "of-

fense level" of 17. Appellant argues that the fine will "unduly burden" his "dependents." *See* U.S.S.G. § 5E1.2(f). This argument, however, is one properly addressed to the district court, not to this court. The Guidelines permit that court to assess a fine between $5,000 and $50,000. Appellant points to no law that forbids the court to assess the maximum fine in the circumstances present here. We therefore find no error in the fine imposed by the district court.

For these reasons, the judgment of the district court is

*Affirmed.*