**UNITED STATES of America, Appellee,**

v.

**Kaya AYMELEK, Defendant, Appellant.**

**No. 90–1510.**

United States Court of Appeals,
First Circuit.

Heard Jan. 7, 1991.

Decided Feb. 15, 1991.

---

Barbara A. McCarthy, for defendant, appellant.

Margaret E. Curran, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., was on brief, for the U.S.

Before SELYA, Circuit Judge,
ALDRICH and BOWNES, Senior Circuit Judges.

SELYA, Circuit Judge.

Two centuries ago, Benjamin Franklin wrote that "in this world nothing is certain but death and taxes." The author was, of course, long departed when Congress enacted the Sentencing Reform Act, as amended, 18 U.S.C. § 3551 *et seq.* (1982 & Supp.1988); 28 U.S.C. §§ 991–998 (Supp. 1988). Were that not the case, one suspects that federal sentencing appeals might have achieved a place in Franklin's litany. This is one such appeal.

The facts of the case are not complex. In August 1989, defendant-appellant Kaya Aymelek was charged with being a deported alien unlawfully present in the United States, in violation of 8 U.S.C. § 1326(a) (1988). He was tried before a jury and duly convicted. The district court sentenced him to five years in prison plus a term of supervised release.

In this appeal, Aymelek concedes his conviction. He reserves his fire for the sentence imposed, challenging both the trial court's construction of the guideline sentencing range (GSR) and its subsequent decision to sentence above that range. Finding appellant's volleys to be wide of the target, we affirm.

## I. HOW THE SENTENCE EVENTUATED

█ Applying the 1987 version of the guidelines,[1] the court began with a base offense level of eight pursuant to U.S.S.G. § 2L1.2(a). Adopting, provisionally, the criminal history assessment contained in the presentence investigation report, the court placed appellant in criminal history category V. After taking evidence, the judge found that appellant had made false statements of material fact, warranting a two-level increase in the offense level and hiking the GSR from 15–21 months to 21–27 months. *See* U.S.S.G. Ch. 5, Pt. A (Sentencing Table). The court then departed upward to 60 months, grounding the extent of its departure on three interim calculations. *See generally United States v. Harotunian,* 920 F.2d 1040 (1st Cir.1990) (discussing difference between eventual departure and interim calculations upon which departure may be predicated; also discussing use of analogues in measuring extent of departure). We will address each of the court's critical rulings separately. Before doing so, however, we outline the court's sentencing paradigm, including its interim calculations, in chart form.

*District Court's Interim Calculations*

1. STEP 1 INITIAL GSR

A. U.S.S.G. § 2L1.2 sets base offense level at 8.

B. Criminal History Category is V.

---

1. Barring *ex post facto* concerns, the guidelines in effect at the time of sentencing, not those in effect when the crime was committed, control at sentencing. *See* 18 U.S.C. § 3553(a)(4); *United States v. Harotunian,* 920 F.2d 1040, 1041–42 (1st Cir.1990). Appellant was sentenced on 27 April 1990, five months after the November 1989 guideline revisions became effective. Inasmuch as application of the 1989 version of the guidelines would have resulted in a higher base offense rating for Aymelek, *see* U.S.S.G. § 2L1.2 (1989) (adding four-level upward adjustment with respect to defendants who were deported following felony convictions), thus raising *ex post facto* concerns here, the district court correctly looked to the 1987 version.

C. **GSR** (OL–8/CHC–V) = **15–21 months.**

2. STEP 2 ADJUSTMENT OF GSR

A. Increase offense level by 2 for obstruction of justice, U.S.S.G. § 3C1.1.

B. **GSR** (OL–10/CHC–V) = **21–27 months.**

3. STEP 3 FIRST PORTION OF UPWARD DEPARTURE (INTERIM CALCULATION)

A. Increase offense level by 4; analogy drawn to U.S.S.G. § 2L1.2(b)(1) (1989) (providing four-level upward adjustment for deported felons).

B. **HYPOTHETICAL GSR** (OL–14/CHC–V) = **33–41 months.**

4. STEP 4 SECOND PORTION OF UPWARD DEPARTURE (INTERIM CALCULATION)

A. Increase criminal history category by one numeral; analogy drawn to what CHC would have been if computation of criminal history score had included prior remote convictions.

B. **HYPOTHETICAL (cumulative) GSR** (OL–14/CHC–VI) = **37–46 months.**

5. STEP 5 THIRD PORTION OF UPWARD DEPARTURE (INTERIM CALCULATION)

A. Increase offense level by 3; no direct analogy (court attributes increase to defendant's pledge to continue committing crime).

B. **HYPOTHETICAL (final) GSR** (OL–17/CHC–VI) = **51–63 months.**

6. STEP 6 FINAL SENTENCE: 60 months (within hypothetical GSR; represents aggregate upward departure of 33 months over top end of actual [adjusted] GSR [*see* Step 2, *ante*]).

II. OBSTRUCTION OF JUSTICE—THE STEP 2 CALCULATION

The judge concluded that appellant had endeavored to obstruct prosecution of the case and mislead the court on two separate occasions. We offer a thumbnail sketch of each incident.

1. In a pretrial motion to dismiss the indictment, appellant contended that his 1986 deportation violated due process, and could not be counted against him, because he was denied law library access while incarcerated during the period of judicial review. In opposing this motion, the government submitted an affidavit from the chief detention officer of the penal institution where appellant had been held. The affiant stated that, during the period of Aymelek's immurement, (1) the prison had a law library; (2) appellant had access to it; and (3) the library contained adequate materials on immigration law. The court denied the dismissal motion. Later, based on this affidavit and supplemental testimony offered at the sentencing hearing, the court concluded that defendant had knowingly misrepresented the facts.

2. In a letter sent to the court on 9 April 1990 (after his conviction but prior to sentencing), appellant stated: "I have not been afforded an opportunity to personally receive or review my presentence report as required by Rule 33 of the Federal Rules of Criminal Procedure." It was subsequently established that this statement was literally false; appellant had been given, and used, close to an hour to review the report. Although appellant tried strenuously to put an innocent face on the seeming contradiction, the judge found to the contrary.

■ U.S.S.G. § 3C1.1 instructs the sentencing judge to increase a defendant's offense level if "the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense...." The government has the burden of proving upward adjustments in offense levels by preponderant evidence, not beyond all reasonable doubt. *See United States v. Sklar,* 920 F.2d 107, 112 (1st Cir.1990) ("the government must prove facts central to increasing a defendant's offense level by a preponderance of the evidence"); *cf. United States v. Ocasio,* 914 F.2d 330, 332 (1st Cir.1990)

(defendant has corresponding "burden of proving his entitlement to a downward adjustment in the offense level"). Where, as here, nisi prius determines that the government carried the devoir of persuasion, bringing section 3C1.1 into play, we review the ensuing adjustment under the clearly erroneous standard. *United States v. Akitoye*, 923 F.2d 221, 229 (1st Cir.1991); *United States v. Wheelwright*, 918 F.2d 226, 228 (1st Cir.1990). We limit our inquiry, therefore, to the question of whether there is sufficient evidence in the record to support a reasoned conclusion that appellant obstructed, or attempted to obstruct, the proceedings.

■ Appellant mounts a four-pronged attack on the obstruction adjustment. First, he argues that the court erred by considering the detention officer's affidavit at sentencing because it was hearsay. This argument is jejune. It disregards the well-established doctrine that a sentencing court may rest upon hearsay evidence so long as it appears reliable. *See United States v. Zuleta–Alvarez*, 922 F.2d 33, 37 (1st Cir. 1990); *United States v. Wright*, 873 F.2d 437, 441 (1st Cir.1989); *see also* U.S.S.G. § 6A1.3(a) ("[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). Aymelek provided no evidence whatever suggesting that the affiant in this case lacked personal knowledge or had reason to prevaricate. The court was entitled to rely upon the affidavit.

■ Next, appellant charges that the lower court erred in refusing to permit his sister to testify at sentencing anent the library issue. The charge is baseless. For one thing, the testimonial proffer was not made until after the court had resolved the question. That was too late. When belatedly advanced, the proffer showed that the witness had no personal knowledge of the situation, but could only have testified that her brother complained to her about the dearth of law books. That was too little. It is surpassingly difficult to imagine what probative value, if any, such testimony might have had.

■ Appellant's third asseveration invokes the commentary to section 3C1.1, which states in part that the defendant's "testimony and statements should be evaluated in a light most favorable to [him]." U.S.S.G. § 3C1.1, comment. (n. 2). This court, joining a host of other circuits, ruled only recently that the quoted language does not require settlement of all evidentiary disputes favorably to the defendant. *See Akitoye*, 923 F.2d at 228. Rather, the note, read in context, suggests only that the sentencing judge "resolve in favor of the defendant those conflicts about which the judge, after weighing the evidence, has no firm conviction." *United States v. Franco–Torres*, 869 F.2d 797, 801 (5th Cir. 1989).

Here, the court had before it sufficient evidence to discredit appellant's claims of sanctimony, even when viewed in their most positive light. The record shows unequivocally that the court, after duly considering all the evidence, was resolute in its determination that appellant had willfully misrepresented material facts. In the section 3C1.1 environment, as elsewhere under the guidelines, "matters of credibility are normally for the trial court, not this court, to decide." *Wheelwright*, 918 F.2d at 228; *see also Akitoye*, 923 F.2d at 228 (application note 2 to § 3C1.1 must be interpreted to "allow[ ] reasonable latitude for credibility assessments" by the sentencing judge). Hence, the judge was free to question, and ultimately to discount, Aymelek's self-serving interpretation of the April 9 letter, deciding instead that the missive was intended to convey the message that its text portended.

■ Appellant's final contention regarding this adjustment is that the court's assessment of the increase was a disguised punishment for appellant's failure to accept responsibility. *See* U.S.S.G. § 3E1.1 (allowing decrease in offense level for acceptance of responsibility). The plaint overlooks the method of the guidelines. While it is true that section 3E1.1 only allows for decreases in the offense level upon a find-

ing that a defendant has genuinely accepted responsibility, not increases in it for failure to own up, a determination that responsibility was not accepted should not preclude an increase for obstruction. Indeed, it will frequently be the case that a defendant who hampers administration of the proceedings will thereby effectively forfeit a credit for acceptance of responsibility. *See* U.S.S.G. § 3E1.1, comment. (n. 4) (1987) ("An adjustment under this section is not warranted where a defendant ... obstructs the trial or the administration of justice ... regardless of other factors.").

We have previously recognized this imbrication, *see, e.g., Wheelwright,* 918 F.2d at 229 (finding of obstruction often indicates that defendant has not accepted responsibility); *United States v. Mata–Grullon,* 887 F.2d 23, 24 (1st Cir.1989) (per curiam) (defendant's false statements showed both obstruction of justice and refusal to accept responsibility), and continue to find the fit comfortable. It follows, then, that there was no double counting or unfairly punitive manipulation. The sentencing court was at liberty to adjust upward for obstruction under section 3C1.1 while at the same time withholding any acceptance-of-responsibility reduction under section 3E1.1.

### III. THE UPWARD DEPARTURE— STEPS 3 THROUGH 5

#### A. *The Standard.*

■ We review a departure's propriety according to the tripartite methodology established in *United States v. Diaz–Villafane,* 874 F.2d 43, 49 (1st Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989), which we have summarized as follows:

First, we evaluate the circumstances relied on by the district court in determining that the case is sufficiently "unusual" to warrant departure. If the stated circumstances pass muster, we proceed to the next rung and determine

whether those circumstances were adequately documented. After the first two levels are climbed, the departure must be measured by a standard of reasonableness. On the third tier, the district court's leeway is substantial.

*United States v. Aguilar–Pena,* 887 F.2d 347, 350 (1st Cir.1989) (citation omitted). We remain mindful, of course, that "a case is sufficiently unusual to warrant departure only where 'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *United States v. Brown,* 899 F.2d 94, 97 (1st Cir.1990) (quoting 18 U.S.C. § 3553(b)). Put another way, "there must be something 'special' about a given offender, or the accouterments of the crime committed, which distinguishes the case from the mine-run for that offense." *Aguilar–Pena,* 887 F.2d at 350.[2]

#### B. *The Use of Analogues.*

In this case, the district court fine-tuned its departure, making a series of interim calculations. *See Harotunian,* 920 F.2d at 1043 (discussing interplay between interim calculations and eventual departure decision). The court made extensive use of analogues in fashioning the extent of the departure. We first discuss the analogue method, and thereafter proceed to examine the several components from which the court constructed the departure.

■ In the areas relevant to our inquiry today, *see supra* note 2, a sentencing court may depart either when it discovers that an offense characteristic was not adequately taken into account by the Sentencing Commission in formulating the guidelines, U.S.S.G. § 5K2.0, or when it receives reliable information that the defendant's criminal history category (CHC) does not adequately reflect his past criminality or the likeli-

---

**2.** The case before us deals only with departures under U.S.S.G. § 5K2.0 and § 4A1.3. Hence, our opinion does not purport to address other situations. *E.g.,* U.S.S.G. § 5K1.1 (government may petition court to depart downward as re-

ward for substantial assistance); U.S.S.G. § 2G1.1(c) (guideline contains "Special Instruction" which may require departure in a given case).

hood that he will commit other crimes, U.S.S.G. § 4A1.3, p.s. On most occasions, this is an "either/or" proposition; the court will decide to depart pursuant either to section 5K2.0 or to section 4A1.3. In an appropriate case, however, a court may amalgamate both grounds into a single departure decision. *See, e.g., United States v. Jackson*, 921 F.2d 985, 988 (10th Cir.1990) (en banc).

The mechanics of a departure operate somewhat differently under the two provisions. Section 5K2.0 departures are less structured, being bounded in extent only by statutorily prescribed maxima and the general parameters of reasonableness. *See* U.S.S.G. Ch. 1, Pt. A, intro. comment., at 1.8 (1987); *see also Harotunian*, 920 F.2d at 1042–43; *Sklar*, 920 F.2d at 115. Section 4A1.3 departures, on the other hand, are more narrowly cabined, the court being specifically instructed to use "as a reference, the guideline range for a defendant with a higher or lower criminal history category, as applicable." U.S.S.G. § 4A1.3, p.s.; *see also United States v. Polanco–Reynoso*, 924 F.2d 23, 25 (1st Cir. 1991); *Jackson*, 921 F.2d at 991; *United States v. Cota–Guerrero*, 907 F.2d 87, 90 (9th Cir.1990); *United States v. Cervantes*, 878 F.2d 50, 53 (2d Cir.1989).[3] There is also an operational difference between the two types of departures when analogues are employed. Most, if not all, of the analogies for section 5K2.0 departures will involve increases or decreases in offense levels, thereby entailing *vertical* shifts in positions on the sentencing grid. *See, e.g., Harotunian*, 920 F.2d at 1042 & n. 3. Within the CHC continuum, however, section 4A1.3 departures require the use of analogies by, in effect, moving from one criminal history category to another, thereby entailing *horizontal* shifts in position on the grid. *See Jackson*, 921 F.2d at 992 & n. 4; *United States v. Ferra*, 900 F.2d 1057, 1062 (7th Cir.1990).

■ The two types of departures do have several things in common. Of overriding importance is that, whether the use of a departure analogy is obligatory under section 4A1.3 or precatory under section 5K2.0, the sentencing court's primary responsibilities remain the same: the court must articulate clearly the reasons for the departure and for its scope, *see, e.g., Harotunian*, 920 F.2d at 1046–47 (commending lower court's explication of section 5K2.0 departure); *Cervantes*, 878 F.2d at 54 (involving section 4A1.3 departure), and must ensure that the departure's direction and extent strike a reasonable balance when weighed against the totality of the circumstances. *Ocasio*, 914 F.2d at 337.

■ We repeat at this juncture the burden of what we wrote in *Ocasio*, where we expressly eschewed any absolute requirement that the sentencing judge be compelled to use analogies to shape the contours of an upward or downward departure.[4] *Id.* at 336. While relevant analogues can be useful tools, they are no more than that. As we have previously indicated, a sentencing court need not resort at all to analogies when departing under section 5K2.0. *See Diaz–Villafane*, 874 F.2d at 51–52 (departure decisions should not simply become "matter[s] of arithmetic" or devolve into "mechanistic bean-counting"). Nor should a sentencing court feel constrained to examine the parameters of every CHC when departing under section 4A1.3. *See Jackson*, 921 F.2d at 991. Under those circumstances where a departure is warranted, the emphasis should be on ascertaining a fair and reasonable sentence, not on subscribing slavishly to a particular formula. Given the limitations which the guidelines already impose on the district court's sentencing discretion, "we are reluctant to stifle the modest amount of play remaining in the joints." *Ocasio*, 914 F.2d at 336.

3. While we have held that the "moving-to-the-next-category" approach is inapposite to departures above the point where the CHC continuum peaks, *Ocasio*, 914 F.2d at 336 n. 4, we do not gainsay its application to departures within the CHC taxonomy. *See id.* at 334.

4. We exempt from this statement those instances, discussed *supra*, where U.S.S.G. § 4A1.3 requires a court to move horizontally across the grid.

It is against this backdrop that we turn to the specifics of the decision below. We address separately each of the district court's trio of interim calculations (steps 3 through 5).

### C. Classifying Appellant as a Deported Felon—Step 3.

It is beyond dispute that the 1988 amendments to 8 U.S.C. § 1326 applied to appellant. The court noted that, by virtue of these amendments, the maximum penalty was raised from two to five years for aliens deported following felony convictions, and from two to fifteen years for those deported following convictions for aggravated felonies.[5] The guidelines, though, had lagged behind, not incorporating these changes until the November 1989 amendments. *See* U.S.S.G. § 2L1.2(b)(1) (1989) (requiring a four-level upward adjustment for defendants convicted of felonies prior to deportation). In crafting those revisions, the Sentencing Commission also indicated that a court might depart upward from this increased offense level "[i]n the case of a defendant previously deported after sustaining a conviction for an aggravated felony as defined in 8 U.S.C. § 1101(a)...." *Id.* at comment. (n. 3). Since the amended version of section 1326 applied to appellant's crime, and since the Sentencing Commission could not conceivably have considered the increased penalties when drafting the 1987 version of the guidelines, the district court elected to use the incidence of the amended statute, together with the fact that appellant had been deported after a 1978 New Jersey state conviction for illegally selling a 9mm. firearm, as one basis for an upward departure.

We review *de novo* a determination that a particular circumstance is theoretically adequate to support a departure. *Harotunian*, 920 F.2d at 1045; *Diaz–Villafane*, 874 F.2d at 49. Because the amended statute applied to the defendant and could not have been considered by the Sentencing Commission in formulating the 1987 guidelines, we believe that the district court was plainly justified in departing to take account of the lag time between the statutory amendments and the corresponding update of the guidelines.

The front door being nailed shut, appellant tries to exit through a definitional window. While not contradicting the record evidence of the New Jersey conviction, he tells us that he was not a deported felon at all; the district court, he asserts, erred in characterizing his New Jersey conviction as a felony. This argument is unavailing. Although New Jersey styled Aymelek's weapons offense as a misdemeanor, we have recently held that federal, not state, definitions govern under the guidelines:

> Were state classifications to govern the meaning of terms in the sentencing guidelines, the primary purpose of the Sentencing Reform Act, namely, to "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records," 28 U.S.C. § 991(b)(1)(B) (1988), would be severely undermined.

*United States v. Unger*, 915 F.2d 759, 762–63 (1st Cir.1990). Although state law must still be examined to ascertain the elements of a predicate offense, the conviction's ultimate classification, for guidelines purposes, is determined by federal law.[6]

---

**5.** An "aggravated felony" is defined by statute to include "any illicit trafficking in any firearms or destructive devices ... within the United States." 8 U.S.C. § 1101(a)(43).

**6.** *Unger* involved the question of whether, in computing a defendant's criminal history score, a prior offense should be deemed a "status offense" for purposes of U.S.S.G. § 4A1.2(c)(2). We "reject[ed] outright the idea that state law determines whether an offense runs afoul of section 4A1.2(c)(2)." *Unger*, 915 F.2d at 762. We also observed that "the guidelines them-

selves strongly suggest that a state's taxonomy should not be given controlling effect." *Id.* at 763. We believe that the reasoning of *Unger* applies unreservedly to the case at bar and comports fully with analogous Supreme Court precedent. *See, e.g., Taylor v. United States,* —— U.S. ——, 110 S.Ct. 2143, 2150, 109 L.Ed.2d 607 (1990) ("violent felony," as used in Armed Career Criminal Act, is defined in accordance with federal-law standard); *Dickerson v. New Banner Inst., Inc.,* 460 U.S. 103, 111–12, 103 S.Ct. 986, 991, 74 L.Ed.2d 845 (1983) ("conviction" for

Accordingly, we reach the question of whether the elements of appellant's conviction in New Jersey satisfied the "felony" requirement imposed by the applicable version of 8 U.S.C. § 1326. The conviction was for illegal sale of a gun. Appellant, who received a two-to-three year jail sentence (suspended), effectively concedes that the state offense, howsoever denominated, was punishable by more than one year in prison. Clearly, the offense qualified as a felony under federal law. *See* 18 U.S.C. § 3559(a)(5) (a conviction is for a felony so long as the maximum prison term authorized for committing the offense exceeds one year).

The remainder of the *Diaz–Villafane* test is easily passed. The underlying facts—the earlier deportation and the occurrence of the New Jersey conviction—are essentially undisputed. With respect to scope, the court used an analogy, looking to the 1989 version of U.S.S.G. § 2L1.2 for guidance and, as an interim calculation, adjusting Aymelek's offense level upward by the equivalent of four levels. The theoretical effect of this calculation was equivalent to a hypothetical increase of roughly 14 months in the top end of the GSR. We have previously stated that newly refined versions of the guidelines, though not applicable to a particular defendant, may at times furnish insight to the sentencing court when determining the extent of a departure. *See Harotunian*, 920 F.2d at 1046. In the relatively rare situation presented here, where the defendant committed an offense *after* the applicable statute was amended but *before* the corresponding guideline had been revised to reflect the change, resort to the eventual guideline revision for guidance appears to be a sensible, fair-minded approach. Cognizant of the "considerable discretion" possessed by the trial court at the third stage of the departure pavane, *see Diaz–Villafane*, 874 F.2d at 52, we believe that this interim calculation was reasonable in its extent.

### D. *Bewhiskered Convictions—Step 4.*

■ Appellant had amassed seven prior convictions that were not eligible for use in tabulating his criminal history score because they occurred more than ten years before the offense of conviction. *See* U.S.S.G. § 4A1.2(e)(2). Inasmuch as some of the excluded offenses were for serious matters, e.g., assault with intent to rob, unlawful possession of a firearm after a felony conviction, unlawful sale of a firearm, the district judge concluded that CHC–V significantly underrepresented appellant's past criminality. Hence, he used these convictions as a further basis for the upward departure. Appellant assigns error in this respect. Although the question is not free from doubt, we conclude that, in light of the convictions' nature, they could be considered in the departure decision.

U.S.S.G. § 4A1.2(e) instructs the sentencing judge, when calculating criminal history scores, to exclude prior sentences of thirteen months or longer that occurred over fifteen years before the offense of conviction was perpetrated and to shun all other sentences more than ten years old. Such convictions may, however, be used in other ways where appropriate circumstances are extant. For example, the Sentencing Commission has indicated that a court may consider outdated convictions for purposes of an upward departure "[i]f the government is able to show that [the] sentence ... is evidence of similar misconduct...." U.S.S.G. § 4A1.2, comment. (n. 8). Be that as it may, the present departure cannot be justified on this basis inasmuch as none of appellant's remote convictions were similar to the crime for which he was prosecuted below.

This court has yet to address whether the guidelines provide another basis upon which outdated convictions, not of the same genre as the offense of conviction, may be utilized to ground a departure. The logical source of such an alternative basis would be U.S.S.G. § 4A1.3 (permitting a departure if the CHC does not adequately reflect the gravity of defendant's past criminality or portrays a solid likelihood that defen-

purposes of 18 U.S.C. § 922(g) & (h) is a matter of federal law).

dant will commit other crimes). We have previously upheld departures under the first branch of section 4A1.3, *see, e.g., Ocasio*, 914 F.2d at 334 (discussing underrepresentation of criminal history as a basis for upward departure); *Brown*, 899 F.2d at 97–98 (similar), but not in a case where the alleged underrepresentation consisted of outdated, nonsimilar convictions. Most of our sister circuits, when confronted with the question of how to handle such convictions, have not prohibited district courts from factoring them into the departure calculus. *See, e.g., United States v. Williams*, 910 F.2d 1574, 1578–79 (7th Cir. 1990) (outdated convictions may be considered pursuant to § 4A1.3 in appropriate circumstances); *United States v. Russell*, 905 F.2d 1439, 1444 (10th Cir.1990) (same); *United States v. Carey*, 898 F.2d 642, 645–46 (8th Cir.1990) (same); *United States v. Lopez*, 871 F.2d 513, 514–15 (5th Cir.1989) (same); *but see United States v. Leake*, 908 F.2d 550, 554 (9th Cir.1990) (an upward departure cannot be based on remote convictions having no similarity to the offense of conviction).

 Construing section 4A1.3 to allow a judge, at whim, to seize upon remote convictions as a foundation to support an upward departure would make a mockery of the temporal strictures contained in U.S.S.G. § 4A1.2(e). Equally, to construe the guideline as demanding that a judge play the ostrich—completely ignoring remote convictions regardless of how many there are or how unusual the circumstances might be—would vitiate the "quantitative" type of departure specifically contemplated by the guidelines, *see, e.g., Sklar*, 920 F.2d at 115 (discussing differences between "quantitative" and "qualitative" departures), and would blind the court to circumstances deserving of consideration. *Cf., e.g., id.* at 116 (rehabilitation, even though considered generally in formulating the guidelines, may nevertheless justify a downward departure "if significantly unusual in a given case"). We reject both extremes, preferring to follow the middle path. We therefore read section 4A1.3 as providing the opportunity to ground a departure on a defendant's remote convic-

tions when and if those convictions evince some significantly unusual penchant for serious criminality, sufficient to remove the offender from the mine-run of other offenders. *Cf. Brown*, 899 F.2d at 98 ("[Defendant's] criminal history, manifestly underrepresented by the guideline computation, is a sufficiently 'unusual' circumstance upon which to ground a departure."). In the instant case, we believe that appellant's seven earlier convictions, though outdated, were distinguished by their numerosity and dangerousness. Hence, the district court could rely upon them in mulling an upward departure.

Once that hurdle is cleared, no further obstacles appear. There was a factual basis for the remote convictions. The portion of the departure which the judge attributed to them was calculated in conformity with U.S.S.G. § 4A1.3 (directing the judge to depart to the category that most closely resembles the defendant's authentic criminal history). *See generally United States v. Thomas*, 914 F.2d 139, 144 (8th Cir.1990) (explaining mechanics). Here, the court moved across the grid, from category V to category VI, to construct its analogy (step 4), on the theory that, if the outdated convictions had been counted, appellant's criminal history score would have placed him well within the latter classification. There was no error.

### E. *The Avowal to Return—Step 5.*

 The third integer in the lower court's departure equation derived from appellant's vow, when arrested, to continue his efforts to reenter the country illegally if deported once more. The court reasoned "that there should be an additional departure ... [in] that the felon falls into the aggravated category because [he] has expressed an intent to continue committing this crime for as long as he apparently pleases." Reading the sentencing transcript in its entirety, we think it is sufficiently clear that the court considered appellant's pledge as an aggravating factor in itself, warranting a further departure. Moreover, the record adequately supports the trial court's findings that the avowal

**74**

was made and that Aymelek, despite his later disclaimers, was sincere in his espousal of it. *See United States v. Bradley,* 917 F.2d 601, 605 (1st Cir.1990) (discussing district court's right to make credibility judgments in guideline sentencing); *United States v. Jimenez–Otero,* 898 F.2d 813, 814–15 (1st Cir.1990) (similar).

These findings are dispositive: brazen defiance of authority, in the form of assured recidivism, can be considered an atypical factor sufficient to take a case beyond the heartland for the offense of conviction. Under the totality of the circumstances approach favored in this circuit, *see Ocasio,* 914 F.2d at 337, the avowal to return, especially when voiced by one who had already reentered the country illegally, having originally been deported after committing an aggravated felony,[7] justified the incremental punishment ordered by the court (corresponding to a three-level increase in the offense level).

## IV. CONCLUSION

We need go no further. The district court's computation of the guideline sentencing range was not clearly erroneous. Moreover, the court acted lawfully and reasonably at Step 6, not only in determining to depart upward but also in formulating the departure's overall extent. The resultant sentence was proportionate to both the circumstances of the offense and the relevant attributes of the offender.

*Affirmed.*

---

**7.** We have already ruled that Aymelek's New Jersey conviction was tantamount to a "felony" under federal law for sentencing purposes. *See supra* Part III(C). Since the crime involved "illicit trafficking in ... firearms," 8 U.S.C. § 1101(a)(43), quoted *supra* note 5, it was an "aggravated felony" under the federal-law standard.