USCA1 Opinion

 

United States Court of Appeals

For the First Circuit

No. 01-1910

UNITED STATES OF AMERICA,

Appellee,

v.

NELSON MARQUEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

 Boudin, Chief Judge,

Selya and Lipez, Circuit Judges.

 Lenore Glaser and Stern, Shapiro, Weissberg & Garin on brief
for appellant.

 Michael J. Sullivan, United States Attorney, and David
Hennessy, Assistant United States Attorney, on brief for appellee.

February 12, 2002

 SELYA, Circuit Judge. This appeal requires us to examine
the so-called "safety valve," 18 U.S.C. § 3553(f) -- a device
through which a court may sentence a defendant without regard to an
otherwise-applicable statutory mandatory minimum, provided that the
defendant meets certain criteria. After perscrutation of the
parties' briefs and the record, we conclude that the sentencing
court's refusal to apply the safety valve was neither clearly
erroneous nor based upon a mistaken view of the law. Consequently,
we affirm the sentence imposed below.

I.

Background

 We derive the facts from the Rule 11 colloquy and the
undisputed portions of the presentence investigation report. See,
e.g., United States v. Dietz, 950 F.2d 50, 55-56 (1st Cir. 1991).

 Reinard Devarie headed a drug-trafficking ring that
distributed heroin in Southbridge, Massachusetts. During a period
of nearly four months beginning in December 1999, Devarie's
organization supplied a local drug dealer, Eddie Santiago, with 100
to 150 bundles of heroin per week. Each delivery comprised
anywhere between 40 to 60 grams of heroin (having a street value in
excess of $20,000). Devarie recruited defendant-appellant Nelson
Marquez, a law-abiding individual who had fallen on hard times, to
assist in the drug-trafficking operation. In that capacity, the
appellant made three of the weekly deliveries to Santiago.

 On March 24, 2000, agents of the Drug Enforcement
Administration (DEA) arrested Santiago. He agreed to cooperate
with the DEA, informed the agents of Devarie's role, and arranged
a meeting between Devarie and an undercover officer (whom Devarie
believed to be Santiago's accomplice). The meeting took place on
March 30, 2000. At that time, DEA agents observed Devarie seated
in a parked car as the appellant stood nearby, looking in all
directions. The undercover officer met with the two men, and
Devarie told him to remember the appellant's face because, if any
heroin were to be returned, it should be delivered to the
appellant. Return of the heroin proved to be unnecessary because
the undercover officer eventually persuaded Devarie to permit him
to continue selling drugs to Santiago's clientele. The officer
then paid Devarie $2,000 on account, declaring that the money was
derived from heroin sales. The appellant remained in attendance
throughout the discussion (although he later professed not to have
heard much of the conversation).

 The appellant was arrested on April 5, 2000, and a
federal grand jury thereafter charged him with conspiracy to
distribute heroin, 21 U.S.C. § 846, and distribution of heroin, id.
§ 841(a)(1). After some initial skirmishing (not relevant here),
the appellant pleaded guilty to both counts of the indictment.(1) At
the disposition hearing, the district court determined that the
appellant was accountable for 320 grams of heroin and set his base
offense level at 26. See USSG §2D1.1(c)(7). The court gave the
appellant a full three-level credit for acceptance of
responsibility, USSG §3E1.1, thus reducing his offense level to 23. 
The court also ascertained that the appellant belonged in criminal
history category I. Based on these determinations, the court
concluded that the appellant's guideline sentencing range (GSR) was
46 to 57 months.

 The GSR proved to be illusory: because the appellant was
responsible for more than 100 grams of heroin, he was subject to a
five-year statutory mandatory minimum term of immurement. See 21
U.S.C. § 841(b)(1)(B)(i). Defense counsel beseeched the court to
ameliorate the harshness of this prospective sentence by applying
the safety valve provision. If this were done, the appellant would
not only avoid the five-year mandatory minimum but also qualify for
a two-level downward adjustment pursuant to USSG §2D1.1(b)(6) (in
which event his GSR would be 37 to 46 months). The district court
refused this entreaty, holding that the appellant did not qualify
for the safety valve provision. The court thereupon sentenced the
appellant to a five-year incarcerative term, a supervised release
term of four years, and a $200 special assessment. This appeal
ensued.

II.

Standard of Review

 The battleground on appeal centers on the district
court's ruling that the appellant did not qualify for the safety
valve. To the extent that such a ruling depends on differential
factfinding, we review it for clear error. See United States v.
Ortiz-Santiago, 211 F.3d 146, 150 (1st Cir. 2000). To the extent,
however, that the ruling hinges on an interpretation of the safety
valve provision itself, our review is plenary. See id.

III.

Analysis

 We divide our analysis into several segments. First, we
place the safety valve provision into perspective. Second, we
describe the appellant's proffer, the government's reaction, and
the lower court's decision. We then discuss the appellant's three-pronged attack on the decision.

A.

The Safety Valve
 As we explained in Ortiz-Santiago, "Congress enacted the
safety valve provision, 18 U.S.C. § 3553(f), in order to mitigate
the harsh effect of mandatory minimum sentences on certain first
offenders who played supporting roles in drug-trafficking schemes." 
211 F.3d at 150. Following Congress's lead, the Sentencing
Commission incorporated the statutory text verbatim into the
sentencing guidelines. See USSG §5C1.2. Under this regime, the
safety value applies if:

 (1) the defendant does not have more than 1
criminal history point . . . ;

 (2) the defendant did not use violence or
credible threats of violence or possess a
firearm or other dangerous weapon (or induce
another participant to do so) in connection
with the offense;

 (3) the offense did not result in death or
serious bodily injury to any person;

 (4) the defendant was not an organizer,
leader, manager, or supervisor of others in
the offense . . . and was not engaged in a
continuing criminal enterprise . . . ; and

 (5) not later than the time of the sentencing
hearing, the defendant has truthfully provided
to the Government all information and evidence
the defendant has concerning the offense or
offenses that were part of the same course of
conduct or of a common scheme or plan . . . .

18 U.S.C. § 3553(f); USSG §5C1.2.

 In this instance, the sentencing court found -- and the
government concedes -- that the appellant satisfied the first four
of these criteria: he has no prior criminal record; he did not
carry a firearm, threaten violence, engage in activity that was
shown to involve death or serious bodily harm to others, or occupy
a leadership role in the criminal enterprise. The question, then,
is whether the appellant was sufficiently forthcoming in his post-arrest discussions with the authorities to satisfy the fifth
criterion.

B.

The Proffer and its Sequelae

 Prior to sentencing, the government afforded the
appellant an opportunity to make a proffer for safety valve
purposes. The proffer occurred in a face-to-face meeting held on
May 21, 2001. It purported to cover the appellant's relationship
with Devarie, what he knew concerning Devarie's line of work and
when he knew it, the services that the appellant rendered, and the
terms and conditions of his employment. After the proffer session,
the government identified various statements that it claimed were
untrue or incomplete. These included:

 1. The appellant's protestation that he did not realize
that Devarie was involved in drug-trafficking until Devarie offered
him a job.

 2. The appellant's insistence that he did not know the
type of drug or approximate quantity of drugs that he had delivered
to Santiago.

 3. The appellant's claim that he had been paid only $50
per delivery.

 4. The appellant's denial that he had served as a
lookout for Devarie at the March 30 meeting.

 5. The appellant's denial that he had used the alias
"Tito" in his dealings with Santiago.

 At the disposition hearing, the district court found that
the appellant had not been truthful in these respects, and that
these dissemblings, taken together, indicated that the appellant
"deliberately obfuscated the facts." On this basis, the court
rejected the appellant's claim for relief under the safety value
provision.(2)

C.

The Assignments of Error

 The appellant asserts that the lower court erred in
finding that he did not truthfully and completely provide all the
information that he possessed concerning the offenses of conviction
(and, therefore, that the court erred in declining to accord him
the benefit of the safety valve provision). He grounds this
assertion on three main stanchions. First, he claims that to
undermine a defendant's safety valve proffer, the government may
not rely on an assessment simpliciter of the plausibility of the
proffer, but, rather, must affirmatively produce rebuttal evidence
(an obligation that it did not fulfill here). Second, he asserts
that a defendant only has to provide material information to obtain
access to the safety valve and that any non-disclosures
attributable to him were immaterial. Third, he asserts that, in
all events, the district court's finding was clearly erroneous. 
All three assertions lack force.

 1. The Need for Rebuttal Evidence. "Full disclosure is
the price that Congress has attached to relief under the [safety
valve] statute." United States v. Montanez, 82 F.3d 520, 523 (1st
Cir. 1996). The defendant bears the burden of showing that he has
made full disclosure (and, thus, that he is entitled to the benefit
of the safety valve). United States v. Richardson, 225 F.3d 46, 53
(1st Cir. 2000), cert. denied, 531 U.S. 1203 (2001). This burden
includes the obligation of proving to the court that he has
provided truthful and complete information.

 Here, the sentencing court ruled that the appellant had
failed to carry this burden. In so doing, the court identified
specific instances of omissions from, and false statements in, the
appellant's proffer. The thrust of the appellant's principal
argument is that the government did not adduce any independent
evidence to show that he had been untruthful or unforthcoming, and
that, absent such evidence, the court erred in rejecting his
proffer. The appellant bases this argument on our decision in
United States v. Miranda-Santiago, 96 F.3d 517 (1st Cir. 1996), in
which we wrote that once a defendant credibly demonstrates that she
has provided all information she reasonably could have been
expected to possess, "the government cannot assure success simply
by saying 'We don't believe the defendant,' and doing nothing
more." Id. at 529; see also id. at 529 n.25 (stating that "the
government must [then] at least come forward with some sound reason
to suggest [the contrary]"). To the appellant's way of thinking,
this language requires a sentencing court to premise any
repudiation of a safety valve proffer on "objective" rebuttal
evidence.

 Miranda-Santiago does not establish the principle of law
that the appellant ascribes to it. We clarified this very point in
United States v. White, 119 F.3d 70 (1st Cir. 1997), in which we
held squarely that a sentencing court may reject a safety valve
proffer based on its reasoned assessment of the defendant's
credibility in light of the facts -- and that the court may do so
without the benefit of independent rebuttal evidence.(3) Id. at 74. 
In the albedo of White, it is abundantly clear that Miranda-Santiago stands merely for the proposition that when the record,
taken as a whole, will not support a finding that the defendant has
failed to provide a truthful and complete proffer, the government's
lack of confidence in the proffer is insufficient, in and of
itself, to justify a denial of access to the safety valve.

 The facts of this case contrast sharply with those of
Miranda-Santiago. Here, the government did not simply assert
skepticism about the appellant's proffer. To the contrary, it
identified specific instances in which the proffer fell short, and,
in each instance, explained why it did not credit the veracity of
the appellant's statement. Moreover, it pointed out internal
inconsistencies between the proffer and other statements that the
appellant himself had made.

 The court's findings rest on these same considerations. 
By his own admission, the appellant was engaged in large-scale
narcotics trafficking; he had delivered over 300 grams of heroin
worth tens of thousands of dollars in a relatively compressed time
frame. Based on the activities in which he was engaged and the
officers' observations of him, the appellant's portrayal of himself
as someone who was paid very little and who knew next to nothing
about the details of the transactions in which he participated
beggars credulity. Equally as striking, the appellant's denial
that he was engaged in counter-surveillance during the March 30
meeting was belied by his actions and refuted by the observations
of experienced narcotics agents.

 To say that the sentencing court must close its eyes to
such realities would border on the Kafkaesque. Were we to yield to
the appellant's importunings and insist upon extrinsic evidence,
district courts would be bound to accept even the most arrant
nonsense from a defendant's mouth so long as the government could
not directly contradict it by independent proof. A rule to that
effect would turn the burden of persuasion inside out. We
therefore decline to embrace it. Cf. United States v. Aymelek, 926
F.2d 67, 68 (1st Cir. 1991) (explaining that a sentencing judge is
"free to question, and ultimately to discount," a defendant's
allocution); United States v. Royer, 895 F.2d 28, 30 (1st Cir.
1990) ("The guidelines do not require a sentencing judge to play
the ostrich, burying his head in the sand, struthiously accepting
every allocution at face value, and ignoring the stark reality of
events.").

 To say more on the subject would be supererogatory. The
short of it is that the district court found the appellant's
answers incredible. Given the telltales that dot the record, that
finding was well within the proper sphere of the district court's
authority. See United States v. McDonald, 121 F.3d 7, 10 (1st Cir.
1997) (explaining that credibility judgments at sentencing are for
the sentencing court qua factfinder).

 2. Materiality. The appellant next argues that, as a
matter of law, the safety valve may be denied only when a defendant
fails to provide material information. Building on this
foundation, he asserts that any non-disclosures on his part were
immaterial (and, accordingly, that the lower court lacked the
authority to deny him access to the safety valve). Because this
argument was not made below, we review it only for plain error. 
United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). We
discern none.

 The safety valve provision explicitly obligates a
defendant who seeks relief thereunder to provide "all" information
to the government.(4) 18 U.S.C. § 3553(f); USSG §5C1.2. That
obligation attaches even if the information is not "relevant or
useful." 18 U.S.C. § 3553(f)(5); USSG §5C1.2(5). Accordingly, a
defendant who wishes to take advantage of the safety valve must
make full disclosure, free of "any gap or omission." Montanez, 82
F.3d at 523. Viewed against this backdrop, the appellant's
objection can have force only insofar as it pertains to the scope
of the required disclosure.

 The "scope" limitation is contained in the very language
of the safety valve provision: the required disclosure must
concern "the offense or offenses that were part of the same course
of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5);
USSG §5C1.2(5). At some point in time, it may become necessary to
refine that language more precisely, see United States v. Wrenn, 60 
F.3d 1, 3 (1st Cir. 1995) (noting that possibility), but we need
not do so today. Under any sensible definition, the information
that the appellant withheld was within the scope of a proper safety
valve proffer. We explain briefly.

 The matters here in issue include when the appellant
first knew of Devarie's drug-trafficking activities, the extent of
the appellant's knowledge of the type and quantities of the drugs
purveyed, the amount of remuneration that he received for his
services, whether or not coconspirators referred to him by some
other name, and whether or not he served as a lookout during a
meeting among coconspirators. While some of these matters may
involve interstitial details, all of them bear directly on the
offenses of conviction and concern the same course of conduct that
led to the appellant's arrest. Thus, they are comfortably within
the scope of the safety valve proffer. See, e.g., United States v.
Wilson, 106 F.3d 1140, 1145 (3d Cir. 1997).

 3. Clear Error. This leaves only the question of
whether the district court's determination that the appellant
failed to qualify for the safety valve was clearly erroneous. The
clear-error standard is extremely deferential. Under it, "we ought
not to upset findings of fact or conclusions drawn therefrom
unless, on the whole of the record, we form a strong, unyielding
belief that a mistake has been made." Cumpiano v. Banco Santander,
902 F.2d 148, 152 (1st Cir. 1990).

 In this instance, the sentencing court weighed the facts
with obvious care; the court's detailed articulation of its views
reflects the painstaking attention that it gave to the issues. The
court then made an independent assessment of the appellant's
credibility and found it wanting. Given the circumstantial
evidence supporting that assessment, we decline the appellant's
invitation to second-guess it.

 In this case, as in many cases, the question of
credibility entails a fact-sensitive judgment. While the record
contains no "smoking gun" -- no direct proof of mendacity -- the
totality of the circumstances makes such an inference compelling. 
For our purposes, no more is exigible. Credibility calls fit
neatly within the integument of the clear-error standard, and
"where there is more than one plausible view of the circumstances,
the sentencing court's choice among supportable alternatives cannot
be clearly erroneous." United States v. Ruiz, 905 F.2d 499, 508
(1st Cir. 1990). So it is here.

IV.

Conclusion

 We need go no further. Viewing the record as a whole, we
detect no error in the district court's sentencing determinations.

Affirmed.

1. This was a "straight" plea, that is, the appellant and the
government did not enter into any plea agreement.
2. The court also rejected the appellant's claim of entitlement
to a role-in-the-offense adjustment, holding that the appellant was
neither a "minor" nor a "minimal" participant in the offenses of
conviction. See USSG §3B1.2. Because we find that the five-year
statutory minimum sentence controls here, see text infra, we need
not consider either the propriety of this ruling or the
government's argument that the appellant has waived any claim of
entitlement to a role-in-the-offense adjustment.
3. There, we put in context the language from Miranda-Santiago
upon which the appellant relies. White, 119 F.3d at 74. It would
serve no useful purpose to rehearse that explanation here.
4. We are not concerned, in this case, with the problem of a
defendant who does not furnish information because he innocently
believes that it would be of no interest. Such an innocent
omission might require somewhat different treatment, and we leave
that situation for another day. For now, it suffices to note that,
here, the government plainly sought specific information, and the
appellant responded with misstatements and/or denials that he
possessed such information.