**UNITED STATES of America**

v.

**Peter A. LEBON, a/k/a Melvin Ross, a/k/a "Musky".**

**No. Cr. 91–10289–WD.**

United States District Court, D. Massachusetts.

Sept. 1, 1992.

Michael Tuteur, Asst. U.S. Atty., Boston, Mass., for plaintiff.

John Herlihy, Jr., Boston, Mass., for defendant.

## SENTENCING MEMORANDUM

FUSTE, District Judge.

The defendant, Peter A. Lebon, was found guilty by jury verdict on May 11, 1992, in the District of Massachusetts, for violation of 18 U.S.C. § 922(g)(1), felon in possession of a firearm. He was sentenced on August 4, 1992. A Presentence Report (PSR) was prepared by the probation officer of the court. Based upon the lengthy criminal record of this defendant, the court treated Mr. Lebon as an Armed Career Criminal (ACC) under 18 U.S.C. § 924(e)(1). The defendant raised no objections to the PSR, which included, in PART F, page 20, a listing of the factors that warranted an

upward departure. The PSR states the following:

(101) Per Guideline 4A1.3(a) and (b), the court may depart upward if it is found that the defendant's criminal history score does not adequately reflect the defendant's criminal past and the likelihood that he will continue to commit crimes. Specifically, the defendant has six convictions, totalling six points which could not be counted as he had "maxed out" with four 1–point convictions pursuant to U.S.S.G. § 4A1.1(c). He has three other convictions which, although occurring on different dates, were consolidated for sentencing and were counted as one offense. Furthermore, many of these convictions involved findings of guilt on multiple counts. Lastly, despite the 6–points which could not be counted under 4A1.1(c), he still has 26 criminal history points. To be placed in the highest criminal history category (VI) a defendant needs "13 or more points." This defendant has obviously doubled the threshold amount and might be more suitably placed in a hypothetical criminal history category of XII.

(102) Additionally, if the defendant were to have committed the same instant offense at the time that the current guidelines were in effect, he would now be facing a total offense level of *26* rather than the level *14* he now has. Even more significantly, the defendant, under the current guidelines, would be deemed an Armed Career Criminal under provisions of U.S.S.G. § 4B1.4, which would result in his total offense level being 33. At an offense level of 33 with the defendant's criminal history category of VI, he would be facing a guideline imprisonment range of 235 to 293 months.

At the time of sentencing, the court determined that the base offense level (BOL) was 14 and that the Criminal History Category was VI. By virtue of 18 U.S.C. § 924(e)(1), which requires an enhanced mandatory minimum sentence of fifteen years for defendants who have three or more prior violent or serious drug-related convictions, and U.S.S.G. § 5G1.1(b), the minimum mandatory sentence, of 180

months was determined to be the guideline sentence. The supervised release range was from three to five years and the fine range from $4,000 to $40,000.

Based on the above, the court sentenced the defendant to imprisonment for a term of 240 months. No fine was imposed, and a five-year term of supervised release was set. The court made an upward departure from 180 to 240 months based on the fact that Mr. Lebon's Criminal History Category did not adequately reflect the defendant's criminal past and the likelihood that he will continue to commit crimes. We now expand on the reasons for the upward departure.

## I.

### *The Offense Conduct*

The offense conduct, taken from PART A of the PSR, pages 1–3, ¶¶ (6)–(17), is described as follows:

(6) On August 12, 1990, at approximately 3:30 pm, defendant and a girlfriend, Tina Pina, drove to a public recreation area in Mashpee known as Attaquin Park. After speaking with several friends the defendant—still in his car—noticed that a second man, Thomas Maddox, was sitting on the "hill" overlooking the parking lot. The defendant yelled for Mr. Maddox to come down to talk to him about an argument they had had the previous night. (According to investigators the argument began because Maddox was attempting to impede the defendant's romantic overtures to Maddox's young niece.) The two began to argue again, and one of the men demanded that they "take care of it right now." When defendant began to get out of his car, Mr. Maddox retreated back to the hill. The defendant then wheeled the car around so that he was facing the hill, and yelled either "Clear the kids off the hill! I'm coming back with something for you!" or "Clear the kids off the hill! I'm coming back with a gun!" The defendant and Ms. Pina left the park at high rate of speed.

(7) Within a very short time, the Mashpee Director of Beaches, Howard Neild,

arrived at Attaquin Park on a routine patrol. Mr. Neild was quickly surrounded by seven or eight people who told him of the incident and the defendant's threat to Mr. Maddox. Mr. Neild radioed the Mashpee police dispatcher with the word that "Musky"—defendant's nickname—had just left in a blue Dodge Daytona and had threatened to return with a gun.

(8) At 3:32 pm, Detective Scott McCabe and Patrolman Randy DeMello responded to Mr. Neild's radio call. Officer McCabe spoke with the witnesses on the scene, including Mr. Maddox. Mr. Maddox informed Detective McCabe that "Musky" had threatened to return with a gun. The officers searched the immediate vicinity of Attaquin Park in their cruisers, but were unable to find the defendant at that time.

(9) Meanwhile, Ms. Pina and the defendant—who was visibly angry—drove towards Falmouth.... The defendant entered the house, stayed inside briefly, and returned to the car. Defendant then headed back toward Mashpee.

(10) As defendant and Ms. Pina headed toward Mashpee, they observed a friend of defendant's, Stefan Pina, using a pay phone. Defendant stopped the car and asked Mr. Pina whether he would like to take a drive. When Mr. Pina agreed, the defendant suggested that Mr. Pina drive; Ms. Pina moved into the back seat, and the defendant slid over to the front passenger seat.

(11) At approximately 4:00 pm, Officers DeMello and McCabe—who were parked at the corner of great Neck Road and Route 130, approximately one eighth of a mile from the entrance to Attaquin Park—observed defendant's Dodge Daytona pass by their cruisers and turn onto Route 130 heading toward Attaquin Park. The officers observed the defendant sitting in the passenger seat. Officer DeMello pulled his cruiser in behind the Daytona, followed by Detective McCabe.

(12) As the defendant's car approached the entrance to Attaquin Park, the police officers observed the right directional signal, indicating that the car was to turn onto the Attaquin Park entrance road. The officers activated their overhead lights and sirens. With the cruisers in pursuit, the Daytona drove past the Attaquin Park entrance road and continued on for several hundred yards without pulling over. Finally, the car crossed the street and pulled into a lot in front of "Mr. T's" auto body shop.

(13) Within defendant's car, Ms. Pina—who had been looking at the cruisers pulling in behind their car—turned back toward the front of the car. On the console between the two front seats, Ms. Pina saw for the first time a small, silver handgun. Stefan Pina began to tell the defendant to throw the gun out of the window of the car but the defendant picked up the handgun and thrust it at Ms. Pina. He then ordered Ms. Pina to stash the gun in her pants. At defendant's insistence, Ms. Pina pushed the gun into the front of her jeans.

(14) Once Stefan Pina pulled the Daytona into "Mr. T's," Officers McCabe and DeMello (and within moments, Officer Juskiewicz) pulled their cruisers in behind the Daytona and ordered the occupants out of the car. The officers frisked Mr. Pina, found nothing, and placed him under arrest for driving with a suspended license. The officers then frisked the defendant, again without finding a weapon. The officers asked the defendant about his argument with Mr. Maddox, which defendant confirmed. The defendant told the officers that they were free to search the Daytona.

(15) The officers then asked Ms. Pina whether she would consent to be frisked by a male police officer; she refused. The officers called for a matron and told Ms. Pina—who appeared extremely nervous—to stand in front of a large planter some distance from the Daytona. As they discussed what steps they should next take, Officers McCabe and DeMello observed Ms. Pina make motions with her hand in the dirt inside the planter. Officer DeMello looked more closely at Ms. Pina and saw an ammunition magazine caught in the waistband of her

pants. Officer DeMello walked over and grabbed the magazine—which was fully loaded—and placed Ms. Pin (sic) under arrest. In the dirt of the planter, the officers found a Raven Arms .25 caliber semi-automatic pistol.

(16) The officers spoke with Ms. Pina, who told then (sic) how the defendant had handed her the gun. In light of her comments and the other facts of which they were aware, the officer placed the defendant under arrest.

(17) ATF agents traced the handgun used in this offense and discovered that it had been stolen from Robert Meadows of Maryland, its legal registered owner.

## II.

### Armed Career Criminal (ACC)

The federal Criminal Code, 18 U.S.C. § 924(e), provides that any person who violates 18 U.S.C. § 922(g) and is a felon in possession of a firearm with three previous convictions by any court for a violent felony or a serious drug offense, or both, committed on occasions different from one another, shall be imprisoned for not less than fifteen years.

As the PSR indicates, the defendant has at least five separate prior convictions for violent felonies and/or serious drug offenses. These are listed in the PSR at ¶¶ 34, 48, 50, 51, and 53. The conduct in these five previous offenses was possession of cocaine with intent to distribute, armed robbery of a convenience store, armed robbery of an individual, and kidnapping and assault with intent to commit murder. Consequently, 18 U.S.C. § 924(e) mandates that the minimum sentence that may be imposed upon the defendant is imprisonment for fifteen years or 180 months.

Under U.S.S.G. § 5G1.1(b), "[w]here a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence." Here, the "statutorily required minimum sentence" of fifteen years or 180 months greatly exceeds the maximum sentence suggested by the appli-cable guideline range (PSR BOL calculated at 14: Guideline Imprisonment Range 37 to 46 months). Accordingly, the "statutorily required minimum sentence" of 180 months becomes the applicable guideline sentence. *See United States v. Tisdale*, 921 F.2d 1095, 1099 (10th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 596, 116 L.Ed.2d 619 (1991); *United States v. Taylor*, 882 F.2d 1018, 1032 (6th Cir.1989), *cert. denied*, 496 U.S. 907, 110 S.Ct. 2592, 110 L.Ed.2d 273 (1990). *But see, United States v. Simmons*, 924 F.2d 187, 189 (11th Cir.1991) ("The guidelines applicable to appellant contain no reference to § 924(e).... Where there is no guideline on point, § 2X5.1 controls.").

## III.

### The Upward Departure

The court is of the opinion that the defendant's criminal history and the circumstances of the crime in the present case present "aggravating ... circumstances of a kind or ... degree not adequately taken into consideration by the Sentencing Commission in formulating" the November 1989 guidelines. 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0. For that reason, the court departed upward from the guideline sentence of 180 months (15 years) and imposed a sentence of incarceration of 240 months (20 years). *See, e.g., United States v. Simmons*, 924 F.2d at 190–92 (upward departure from fifteen to fifty years in ACC case found reasonable); *United States v. Fields*, 923 F.2d 358, 361–62 (5th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2066, 114 L.Ed.2d 470 (1991) (upward departure from fifteen to seventeen years in ACC case found reasonable).

As the PSR establishes, defendant's Criminal History Category of VI underrepresents defendant's startling criminal past. Since age 18, the defendant has been involved in dozens of criminal acts, including two armed robberies, an assault and battery with a dangerous weapon, and a kidnapping and assault with intent to murder committed against a woman by the name of Nadeje Ramy. Court and police records reveal that the defendant partici-

pated in the assault and kidnapping of Ms. Ramy in order to extort money for a drug deal on December 3, 1983. The victim was found on December 5, 1983 bound to a support beam in a Dorchester basement with a rope around her neck and the beam, bound hands and feet, eyes and mouth bound with tape, and lying in water approximately one foot deep. After the victim was rescued, she had to be hospitalized for exposure, hypothermia, and fatigue. Defendant's criminal convictions, as listed in the PSR, are twenty-two in number, plus three pending charges for possession of a firearm without a license, receiving stolen property, and possession of cocaine. *See* PSR, PART B, THE DEFENDANT'S CRIMINAL HISTORY, pp. 6–12.[1]

These acts, taken together, qualify for not less than twenty-six criminal history points, twice the number needed to qualify for the maximum Criminal History Category of VI. In addition, because of the quick sequence with which the defendant committed his crimes, several of his convictions were consolidated for sentencing, six of his convictions were excluded from the criminal history calculation through application of U.S.S.G. § 4A1.1(c), and three of the most serious crimes were disposed of through concurrent sentences. *See* PSR, ¶ 51, p. 10, referring to the incident of kidnapping of Nadeje Ramy. Because the sentence for the kidnapping was made concurrent with the previously existing six to ten-year sentence for armed robbery, PSR, ¶ 50, p. 10, the defendant, for all intents and purposes, received no additional punishment for the kidnapping and assault with intent to murder Ms. Ramy.[2]

In short, despite defendant's assigned criminal history points of 26, his true criminal history should be significantly higher. *See United States v. Ocasio*, 914 F.2d 330, 334–35 (1st Cir.1990). The Sentencing Commission, in U.S.S.G. § 4A1.3, makes it clear that a departure under said sentence guideline is warranted when the criminal history category significantly underrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes.[3] Defendant's criminal record brings him squarely within the cases contemplated by U.S.S.G. § 4A1.3.

Defendant's criminal history points of 26 demonstrates on its face that he falls outside the "'heartland,' [the] set of typical cases embodying the conduct that ... [the] guideline[s] describe[ ]." U.S.S.G., Ch. 1, Part A, intro., 4(b). In U.S.S.G. § 4A1.3, the Sentencing Commission expressly

> contemplate[d] that there may, on occasion, be a case of an egregious, serious criminal record in which even the guideline range for a Category VI criminal history is not adequate to reflect the seriousness of the defendant's criminal history. In such a case, a decision above the guideline range for a defendant with a Category VI criminal history may be warranted.

*Id.* Numerous courts, including the First Circuit, have found that criminal history scores at or even somewhat below the defendant's justify an upward departure from the guideline sentence. *See United States v. Moore*, 931 F.2d 3, 4–5 (1st Cir.

---

1. These convictions were for larceny, unlawful distribution of cocaine, several for larceny by means of fraudulent check, motor vehicle violations, malicious injury, threatening to murder and intimidation of witness, assault and battery with dangerous weapon, shoplifting, armed robbery, and larceny of an automobile.

2. The Sentencing Commission, in its Commentary to U.S.S.G. § 4A1.3, notes that departure may be appropriate where, as here, a defendant's criminal history score fails to account for his extensive record of serious, assaultive conduct.

3. The method of departure set forth in U.S.S.G. § 4A1.3 is not, technically speaking, applicable

to the circumstances here, because the "guideline sentence" of fifteen years is based on the statutory minimum rather than on an offense level and criminal history category. *Cf. Simmons*, 924 F.2d at 189 ("Without a starting point on the grid, it is impossible to explain a departure in terms of increases in offense level or criminal history category."). Nevertheless, section 4A1.3 provides a mechanism by which the "heartland" of armed career criminals—e.g., those with criminal history scores still within the guidelines' scale—can be distinguished from those, like the defendant, whose criminal history is well outside of normal bounds.

1991) (upward departure warranted where defendant's criminal history score of 10 excluded 23 other criminal history points); *United States v. Lewis*, 954 F.2d 1386, 1396–97 (7th Cir.1992) (upward departure warranted where defendant had criminal history score of 22); *United States v. Glas*, 957 F.2d 497, 497–99 (7th Cir.1992) (upward adjustment warranted where defendant's 39 criminal history points placed him in a hypothetical category XIV; *compare* PSR, ¶ 101.[4]

Defendant has coupled his criminality with a defiant disregard for the criminal justice system itself. Under U.S.S.G. § 4A1.3, the Commission made clear that additional punishment may be warranted where, as here, the defendant "committed the instant offense while on bail or pretrial release for another serious offense." *Id.* The defendant committed the instant offense while on bail from two drug charges, while still on parole for a previous offense, and only thirteen months after spending five years in prison for multiple violent offenses.[5] "[A] defendant undermines the integrity of the criminal justice system when he commits a crime while ... under its supervision and control." *United States v. Madrid*, 946 F.2d 142, 143 (1st Cir.1991) (quoting *United States v. Hernández*, 896 F.2d 642, 645 (1st Cir.1990)); *United States v. Calderon*, 935 F.2d 9, 11–13 (1st Cir.1991). Defendant has demonstrated through his conduct the manifest "likelihood that [he] will commit further crimes," U.S.S.G. § 4A1.3; as a result, an upward departure is warranted.

Furthermore, the circumstances of the crime of conviction add further justification for an upward departure. The evidence at trial established that defendant possessed a fully-loaded semi-automatic pistol which he intended to use to settle an argument on a public beach filled with people. Both the dangerousness of defendant's weapon, U.S.S.G. § 5K2.6, and the threat he inflicted upon the public, U.S.S.G. § 5K2.14, lend "meaningful and substantial" proof of this defendant's "atypicality," justifying an upward departure. *Ocasio*, 914 F.2d at 335–36.

Under U.S.S.G. § 5K2.6, "the court may increase the sentence above the authorized guideline range ... depend[ing] on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others." Courts have repeatedly held that semi-automatic weapons, such as the one used here, pose special dangers which may rise to the level of an "aggravating ... circumstance ... not adequately taken into consideration by the Sentencing Commission." *United States v. Lopez*, 875 F.2d 1124, 1128 (5th Cir.1989). *See, e.g., United States v. Robinson*, 898 F.2d 1111, 1118 (6th Cir.1990) ("district court may take into account the nature of the firearm, [including] whether it is automatic"); *United States v. Sweeting*, 933 F.2d 962, 966 (11th Cir.1991); *United States v. Thomas*, 914 F.2d 139, 143–44 (8th Cir.1990). Courts have similarly emphasized the fact that the firearm was fully loaded to justify an upward departure. *See, e.g., Thomas*, 914 F.2d at 144.

In addition, both sections 5K2.6 and 5K2.14 authorize departures based on "the extent to which [a weapon] ... endangered others" and the "public['s] ... safety." *See United States v. Sweeting*, 933 F.2d at 966; *United States v. Loveday*, 922 F.2d 1411, 1413–17 (9th Cir.1991). As noted earlier, the evidence established that, had he not been intercepted by Mashpee police just outside the Attaquin Park entrance, the defendant planned to use his fully-loaded gun on a beach filled with dozens of people, including many children. Such conduct plainly "significantly endangered" the "public ... safety," U.S.S.G. § 5K2.14, providing additional support for an upward departure.

## IV.

### *U.S.S.G. § 4B1.4 (November 1990 edition)*

The facts of this case took place in August 1990, roughly three months before the

---

**4.** This suggests that the defendant belongs in a hypothetical Criminal History Category of XII.

**5.** Defendant committed the drug offenses a mere seven months after his release on parole.

effective date of the present version of U.S.S.G. § 4B1.4, November 1990 edition, which increased the BOL for a case like the present one to 33. This, when seen in light of a Criminal History Category of VI, would have entailed a guideline imprisonment range, without an upward departure, of 235 to 293 months. While the 1990 guideline cannot be applied to this defendant, it nevertheless confirms the Sentencing Commission's view that the 1989 guidelines applicable could fail to adequately take into consideration the danger to society posed by armed career criminals. *Ocasio,* 914 F.2d at 335.

The amended guideline, by analogy, substantiates the reasonableness of the 240–month sentence imposed here. *United States v. Aymelek,* 926 F.2d 64, 69–70 (1st Cir.1991); *United States v. Harotunian,* 920 F.2d 1040, 1043 (1st Cir.1990).

### V.

*Conclusion*

The defendant is an armed career criminal within the meaning of 18 U.S.C. § 924(g)(1). The guideline sentence is 180 months imprisonment. An upward departure to 240 months imprisonment is reasonable under the circumstances of the present case.

IT IS SO ORDERED.