UNITED STATES of America, Appellee,

v.

Frederick HARDY, Defendant, Appellant.

No. 95–1841.

United States Court of Appeals,
First Circuit.

Heard April 4, 1996.

Decided Nov. 8, 1996.

Owen S. Walker, Boston, MA, for defendant, appellant.

Ralph F. Boyd, Jr., Assistant United States Attorney, Boston, MA, with whom Donald K. Stern, United States Attorney, and Michael J. Pelgro, Assistant United States Attorney, were on brief for appellee.

Before CYR, BOUDIN and LYNCH, Circuit Judges.

CYR, Circuit Judge.

Frederick Hardy challenges two sentencing rulings by the district court which successively denied him a downward adjustment for acceptance of responsibility and imposed an upward departure following his trial and conviction on three felony charges. We affirm the district court judgment.

## I

## BACKGROUND

### A. The Offense of Conviction

On the evening of April 18, 1991, multiple gunshots rang out on the grounds of the Lenox Street Housing Development in Boston. Five Boston police officers in plain clothes, members of the Anti-gang Violence Unit, were on routine patrol at the time, and saw Raymond Moreno, Stephen Fernandes, and appellant Hardy run from the area where the shots had been fired. The officers gave chase on foot. Just before submitting to arrest, Moreno handed a long, dark, cylindrical object to Hardy, who kept on running through the residential neighborhood adjacent to the housing development. Shortly after the officers overtook Hardy, but before he could be subjected to arrest, he tossed a loaded Browning .32 caliber semi-automatic pistol onto the ground.

Following Hardy's arrest, the officers retraced his likely route from the shooting scene to the arrest scene and found a fully-loaded, sawed-off, twelve-gauge, double-barrel shotgun planted barrel-up in the backyard garden of a residence occupied by a family with three young children. Nearby, Fernandes was arrested while in possession of an unloaded Helwan 9 millimeter semiautomatic pistol, later confirmed to be the firearm discharged at the Lenox Street Housing Development site where the police first observed Hardy and two associates. Later, Hardy falsely denied knowing either Moreno or Fernandes, claimed to be living with his mother, and gave a false home address.

### B. The Trial and First Appeal

Hardy was charged with being a felon in unlawful possession of a firearm, 18 U.S.C. § 922(g)(1), as well as unlawful possession of ammunition, id., and with possession of an unregistered firearm, 26 U.S.C. § 5861(d). As Hardy's extensive criminal record included three violent felonies and one serious drug offense since 1985, the government gave notice that it intended to seek the mandatory minimum fifteen-year prison sentence authorized under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e); see also U.S.S.G. § 4B1.4. Following trial, Hardy was convicted and sentenced to 262 months in prison.

While Hardy's first appeal was pending, this court held that a criminal defendant exposed to an ACCA sentencing enhancement may challenge any predicate state court conviction during his federal sentencing proceeding even though his state court remedies have never been exhausted. United States v. Paleo, 967 F.2d 7, 11–12 (1st Cir.1992). We accordingly remanded Hardy's case to the district court for reconsideration in light of Paleo.

### C. The First Remand and Second Appeal

On remand, the district court again imposed a 262–month prison term, after rejecting Hardy's claim that his predicate state court convictions were invalid. United States v. Hardy, 829 F.Supp. 478 (D.Mass. 1993). Hardy again appealed. Without reaching the sentencing claims, this court vacated Hardy's federal convictions on the ground that the prosecution had made improper comments during closing argument at trial. United States v. Hardy, 37 F.3d 753 (1st Cir.1994).

### D. The Second Remand and Sentencing

During the second remand, Hardy obtained a continuance and successfully challenged two of the predicate state court convictions. As he was no longer subject to the ACCA mandatory minimum sentence, he then pled guilty to all three federal charges.

At the resentencing, the district court began its guideline calculation with a base of-

fense level (BOL) of 18, *see* U.S.S.G. § 2K2.1(a)(1) (Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition) (1990), then adopted a revised presentence report (PSR) recommendation that Hardy not receive a two-level downward adjustment for acceptance of responsibility, *see id.* § 3E1.1.[1] The court set Hardy's criminal history category (CHC) at III (6 points), by counting four unvacated prior convictions at one point each, *see id.* § 4A1.1,[2] and adding two points because Hardy was on probation at the time the offense of conviction was committed. The resulting guideline sentencing range (GSR) for Level 18, CHC III, was 33 to 41 months.

The district court decided to make an upward departure due to Hardy's "ten-year history of grievous antisocial conduct," citing eight reasons: (1) CHC III did not adequately reflect either the seriousness of Hardy's past criminal conduct or the likelihood of recidivism; (2) only one month before the offense of conviction, Hardy had been arrested and charged with another "very serious offense"—his and Moreno's shooting and attempted murder of a fourteen-year-old boy, Kenneth Walker, at the same Lenox Street Housing Development; (3) Hardy was on bail in the Walker case at the time he committed the offense of conviction; (4) Hardy had been arrested and charged with four violent felonies between 1985 and 1990, including kidnapping and assault and battery, which were not taken into account in the CHC III calculation since the state court charges had been dismissed; (5) Hardy's two prior state court convictions for assault and battery against his girlfriend and another woman had been

vacated, not because Hardy was not responsible for the criminal conduct underlying the convictions but due to procedural infirmities at trial;[3] (6) "the [two] weapons used ... in this federal case [a sawed-off shotgun and semi-automatic pistol] were particularly dangerous weapons"; (7) officers of the Anti-gang Violence Unit attested that the offense of conviction was part of a long series of violent drug-related offenses in the same neighborhood, committed by street gangs like the Columbia Point Dogs, of which Hardy, Moreno, and Fernandes were known members; and (8) the offense of conviction occurred in an economically depressed neighborhood "where very vulnerable people live."

The district court determined that even a full "horizontal" departure from Level 18, CHC III (33–41 months), to Level 18, CHC VI (57–71 months), would be inadequate to reflect these eight factors. Accordingly, the court determined upon a "vertical" upward departure as well, from Level 18, CHC VI (57–71 months) to Level 24, CHC VI (100–125 months). The court gauged its vertical departure through reference to the 121–151 month (Level 32, CHC I) GSR which would have been applicable to Hardy under the then-current (*i.e.*, November 1994) guidelines.[4] Ultimately, the court settled upon the 120–month prison sentence from which Hardy now appeals.

## II

### *DISCUSSION*

#### A. *Acceptance of Responsibility*

■ The district court denied a two-level downward adjustment for acceptance of re-

---

1. Unless otherwise indicated, we cite to the November 1990 guidelines in effect on the date of the offense of conviction.

2. The four state-court convictions counted by the district court were: (1) a 1985 conviction for cocaine possession; (2) a 1988 conviction for assault and battery on a police officer; (3) a 1990 conviction for drug possession; and (4) a 1990 conviction for possession with intent to distribute cocaine and heroin at Lenox Street.

3. According to the revised PSR, the 1985 assault and battery charges were based on evidence that Hardy, in a jealous rage, kicked his girlfriend in the head and upper body then punched her in the head before throwing her over a third-floor

balcony. In the subsequent incident, he assaulted the same girlfriend and her sister, beating both women about their heads and faces. Hardy's girlfriend was hospitalized on both occasions.

4. The court arrived at its adjusted BOL of 32 by increasing the BOL (26) six levels based on "various offense characteristics." Although the court did not cite to the particular guideline sections, the government concedes that the relevant guidelines were U.S.S.G. § 2K2.1(b)(4) (1994) (use or possession of firearm with an obliterated serial number) and § 2K2.1(b)(5) (1994) (use or possession of firearm in connection with another felony offense [*i.e.*, ongoing drug distribution] ).

sponsibility, *see* U.S.S.G. § 3E1.1, for the following reasons:

> There was in fact a trial of the offense in this case four or so years ago, [during which] the defendant denied knowing the codefendant in that case, and ... that ... does bespeak ... failure to accept responsibility, and then there was an appeal ... during which there still was no acceptance of responsibility, and ... I think I should consider the fact ... that a plea of guilty in this case did not occur ... until [after Hardy's two predicate convictions had been set aside in state court.] I don't criticize counsel for undertaking that because it makes some difference to the kinds of sentence that may be ultimately imposed in this case, but it strikes me that none of this suggests that there has been a sincere acceptance of responsibility.

Hardy asserts two challenges to the district court ruling.[5]

■ First, while acknowledging that he must establish any entitlement to an adjustment for acceptance of responsibility, *see United States v. Gonzales,* 12 F.3d 298, 300 (1st Cir.1993), Hardy argues that section 3E1.1 creates a rebuttable presumption that a defendant who has pled guilty has carried his burden of proof, even though the record discloses no affirmative manifestations of remorse. U.S.S.G. § 3E1.1, comment. (n.3) (1994).

This contention is severely undercut by the pertinent guideline commentary, however, which plainly provides that "[e]ntry of a plea of guilty *prior to* the commencement of *trial combined with truthful admission* of involvement in the offense and related conduct *will constitute significant evidence* of acceptance of responsibility." U.S.S.G. § 3E1.1, comment. (n.3) (emphasis added). The revised PSR discloses that Hardy, despite ample time and opportunity, has *never* truthfully admitted the facts underlying the offense of conviction, let alone subjectively manifested

"candor and authentic remorse." *See United States v. Wheelwright,* 918 F.2d 226, 229 (1st Cir.1990).

■ Moreover, even assuming Hardy had truthfully admitted the relevant facts, nothing in the commentary upon which he relies remotely indicates that a guilty plea, even combined with a truthful admission, *see* U.S.S.G. § 3E1.1, comment. (n.3), gives rise to a rebuttable presumption that a two-level downward adjustment for acceptance of responsibility will follow. Indeed, Hardy's prolonged reticence aside, the commentary explicitly states that even the "significant evidence of acceptance of responsibility" generated by "a plea of guilty prior to the commencement of trial combined with truthful admission," *id.,* "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. *A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." Id.* (1994) (emphasis added); *see* U.S.S.G. § 3E1.1(c) & comment. (n.3) (1990).

■ Rather, the sentencing court must engage in a fact-intensive determination based on all evidence material to the defendant's acceptance of responsibility. We in turn accord great deference to the sentencing court's determination. *See id.* comment. (n.5); *United States v. Royer,* 895 F.2d 28, 29 (1st Cir.1990) ("Credibility and demeanor play a crucial role in determining whether a person is genuinely contrite," and "the sentencing judge has the unique opportunity of observing the defendant ... and evaluating acceptance of responsibility in a live context."). Thus, nothing can come from Hardy's "rebuttable presumption" construct, both because it is legally unsound and because Hardy lied to the police and to a magistrate judge regarding his lack of prior association with codefendants Moreno and Fernandes, and gave a false home address which has never been recanted.[6]

---

5. Sentencing Guidelines interpretations are reviewed *de novo, United States v. Bennett,* 60 F.3d 902, 904 (1st Cir.1995), whereas subsidiary factual findings, including the ultimate determination whether a defendant has sincerely "accepted responsibility" for the charged offense, are reviewed only for clear error, *United States v. Crass,* 50 F.3d 81, 83 (1st Cir.1995).

6. As a corollary argument, Hardy urges a third remand for resentencing because he was unfairly surprised by the sentencing court's refusal to

■ Second, Hardy contends that he reasonably refrained from pleading guilty until after he had returned to state court to set aside two of his predicate convictions, since the government's decision to invoke the ACCA otherwise would have exposed him to a possible life sentence and at least a fifteen-year sentence, instead of a ten-year maximum. Consequently, he argues, the district court improperly relied on the delayed guilty plea as a basis for finding that he had not accepted responsibility for his crimes.

It is far from clear that the statement made by the district court was intended to convey the message Hardy suggests. Viewed in context, the statement may well have been intended merely as a narrative of the prolonged procedural travel of this case, during which Hardy never uttered a word remotely resembling remorse. In all events, assuming the statement were to be interpreted as Hardy suggests, we conclude that any resulting error was harmless in that it did not affect Hardy's substantial rights, *see* Fed.R.Crim.P. 52(a); *United States v. Curran*, 926 F.2d 59, 62 (1st Cir.1991), since the alternative basis for denying the requested § 3E1.1 reduction was entirely valid.[7]

After his arrest, Hardy lied when he told the police he had not known codefendant Moreno prior to April 18, 1991, whereas in fact Hardy and Moreno had shot Kenneth Walker in March 1991. In addition, the record reveals that Hardy, after his arrest, lied about not having possessed a firearm, and gave police a false home address. Undeterred, Hardy argues that a false statement

to the police immediately after arrest—as distinguished from a misrepresentation to the probation office or the court after criminal proceedings have been commenced—should not be treated as a failure to accept responsibility. We need venture no opinion on this matter, since Hardy cannot come within the proposed rule in any event.

Rather, the revised PSR indicates that though Hardy first provided the false home address to the police, thereafter he repeated it to the United States Pretrial Services Department and a magistrate judge. Moreover, Hardy lied about possessing and concealing the dangerous firearm (sawed off shotgun) rather than assisting in its recovery, and has never recanted. Finally, he attempted to evade and resist arrest rather than surrender voluntarily. By contrast, the applicable guideline commentary clearly identifies the *kinds* of conduct considered indicia of acceptance of responsibility: a "voluntary and truthful admission to authorities of involvement in the offense," a "voluntary surrender to authorities promptly after commission of the offense," and "voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense." *See* U.S.S.G. § 3E1.1, comment. (n.1(c)-(e)).

We emphasize that it was especially appropriate in these circumstances for the district court to consider "the timeliness of the defendant's conduct in manifesting ... acceptance of responsibility," *see* U.S.S.G. § 3E1.1, comment. (n.1(g)), particularly since Hardy failed even to request a continuance to chal-

---

follow "accepted" practice in the United States District Court for the District of Massachusetts by allowing an automatic § 3E1.1 reduction to any defendant who pleads guilty. Even assuming such a practice, which the government disputes, Hardy's reliance upon it would be objectively unreasonable given the unequivocal guideline provision that "[a] defendant who enters a guilty plea is not entitled to a sentencing reduction under this section as a matter of right," U.S.S.G. § 3E1.1(c), not to mention the decisional law in this circuit, *see United States v. Garcia*, 905 F.2d 557, 561 (1st Cir.) ("Downward adjustments for acceptance of responsibility are not automatically conferred upon every accused who pleads guilty."), *cert. denied*, 498 U.S. 986, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990). Since § 3E1.1 makes clear that the district court must assess each defendant's protes-

tations of remorse, it would be inconsistent with its spirit to permit defendants to withhold manifestations of remorse simply because the district court has not explicitly invited them. *See Royer*, 895 F.2d at 30 (noting that § 3E1.1 is not designed to encourage "empty platitudes").

7. *See United States v. Nunez–Rodriguez*, 92 F.3d 14, 19 (1st Cir.1996) (noting that a sentencing decision founded on an inappropriate factor may be affirmed if "excision of the improper ground does not obscure or defeat the reasoning of the district court," and we are "left, on the record as a whole, with the definite and firm conviction that removal of the inappropriate ground would not be likely to alter the district court's view of the sentence rightfully to be imposed").

lenge the predicate state court convictions *before his first trial.* By ignoring this plain option, and failing to explain, Hardy put the government to the needless expense of trying him. *See United States v. De Leon Ruiz,* 47 F.3d 452, 455 (1st Cir.1995) (citing U.S.S.G. § 3E1.1, comment. (n.2) (1994)). Finally, the sentencing court assiduously searched the record and observed Hardy's in-court demeanor for any indication that he was truly remorseful. Instead, it found only his unelucidated guilty plea, with no mention of remorse, and an extensive record of persisting criminal conduct "inconsistent" with genuine remorse. We find no error.

## B. *Upward Departure*

■ A decision to depart beyond the prescribed GSR is reviewed for "abuse of discretion" only, *see Koon v. United States,* —— U.S. ——, —— – ——, 116 S.Ct. 2035, 2046–47, 135 L.Ed.2d 392 (1996), and guided by three principal inquiries: (1) whether the asserted grounds for departure were permissible under the guidelines; (2) if so, whether the record evidence adequately demonstrates the required criteria; and (3) whether the degree of departure was reasonable. *See United States v. DeMasi,* 40 F.3d 1306, 1322 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 947, 130 L.Ed.2d 890 (1995). Hardy assigns nine reasons for overturning the upward departure.

### 1. *Validity of the Departure Criteria*

The guidelines prescribe two types of departure mechanisms. Section 4A1.3 focuses primarily on past criminal conduct, and permits an upward departure if the defendant's pre-departure CHC, *see* U.S.S.G. § 4A1.1, "does not adequately reflect the seriousness of [his] past criminal conduct or the likelihood that the defendant will commit other crimes." *Id.* § 4A1.3. Normally, these section 4A1.3 departures are "guided" and horizontal. That is, within the defendant's total offense level the court moves horizontally

across the sentencing table through successively higher CHCs until it reaches an appropriate, or "reflective" sentencing range. Only in extreme cases—those involving egregious past criminal conduct—may a section 4A1.3 departure exceed the GSR prescribed under CHC VI. *See United States v. Mendez–Colon,* 15 F.3d 188, 190 (1st Cir.1994).[8]

Section 5K2.0, on the other hand, permits an upward departure if the district court finds "an aggravating ... circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)). The section 5K2.0 departure mechanism focuses primarily on "unusual" *attributes of the offense of conviction,* rather than any underrepresentation of past criminal conduct in the defendant's CHC. Section 5K2.0 departures are "unguided," and functionally "vertical," meaning that the sentencing court need not restrict itself to considering successively higher CHC ranges along the "horizontal" axis in the sentencing table, but may select whatever sentence appropriately reflects the "unusual" circumstances in the case. *See generally* Bruce M. Selya & Matthew R. Kipp, *An Examination of Emerging Departure Jurisprudence Under the Federal Sentencing Guidelines,* 67 Notre Dame L.Rev. 1, 39–40 (1991).

■ Hardy first argues that the district court committed an error of law by relying on the number and dangerousness of the weapons used by him and his two associates in the Lenox Street shooting spree as grounds for an upward departure. He points out that the November 1990 guidelines expressly constitute the number of firearms a specific offense characteristic under section 2K2.2 (Unlawful Trafficking), but not under section 2K2.1 (Unlawful Possession), thereby implicitly rejecting the number of firearms as a ground for departure under section 2K2.1.

8. Under U.S.S.G. § 4A1.3 (November 1990), the sentencing court was permitted to depart beyond CHC VI to any appropriate higher sentence under § 4A1.3 ("unguided" sentence), whereas under the current version departures beyond CHC VI are "guided"; that is, beyond CHC VI, sentencing courts are to move down the CHC VI column to successively increasing offense levels until an appropriate sentencing range is reached. *United States v. Emery,* 991 F.2d 907, 913 n. 9 (1st Cir.1993).

*See United States v. Enriquez–Munoz,* 906 F.2d 1356, 1361 (9th Cir.1990). *But see* U.S.S.G. § 2K2.1 (1994) (amended version, designating number of firearms as specific offense characteristic). Hardy also notes that section 2K2.1(a)(1) and 26 U.S.C. § 5861 already provide a twelve-level sentencing enhancement for the increased risk inherent in possessing some types of firearms (*e.g.,* Hardy's sawed-off shotgun), *see* U.S.S.G. § 2K2.1(a), thereby suggesting that the Commission meant to foreclose departures based on the "dangerousness" of all other weapon types (*e.g.,* Hardy's semi-automatic pistol).

■ Notwithstanding the explicit consideration given to the number of firearms in U.S.S.G. § 2K2.2, a departure criterion cannot be deemed impermissible in all circumstances unless categorically foreclosed by the Commission. *See Koon,* —— U.S. at ——, 116 S.Ct. at 2051. The Commission "d[id] not intend to limit the kinds of factors, *whether or not mentioned anywhere else in the guidelines,* that could constitute grounds for departure in an unusual case." U.S.S.G. Ch. 1, Pt. A, intro. comment.(4)(b) (emphasis added).

Hardy pled guilty to certain firearm *possession* charges. The reference to the number of firearms was made by the district court in the context of its discussion of the heightened dangerousness associated with the manner in which Hardy and his cohorts not only possessed but *used* their firearms. *See infra* Section II.B.2(b); *cf. Enriquez–Munoz,* 906 F.2d at 1361 (rejecting departure based on number of weapons and defendant's intent to cause "greater harm," where sentencing court made no finding of such intent, and purchase/sale of multiple weapons created no demonstrably greater harm). The use and/or indiscriminate disposal of multiple weapons which took place in this case surely elevated their dangerousness well above the level associated with the simple possession of a single firearm.

Moreover, rather than being categorically forbidden as a departure ground under section 2K2.1, the heightened dangerousness occasioned by the usage, and indiscriminate abandonment, of the firearms involved here is encouraged as a departure ground in appropriate circumstances:

> If a weapon or dangerous instrumentality was *used or possessed* in the commission of the offense the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the dangerousness of the weapon, the manner in which it is used, and the extent to which it endangered others. *The discharge of a firearm might warrant a substantial sentence increase.*

*See* U.S.S.G. § 5K2.6 (emphasis added).[9]

Finally, the fact that the Commission decided against making "weapon type" a specific offense characteristic under section 2K2.1 in no sense indicates that it intended to preclude a judicial determination that certain types of weapons are inherently more dangerous than others, but simply that possession of a particular type of weapon, in and of itself, is not invariably indicative of the defendant's intent. For example, the guidelines permit a downward adjustment for the illegal possession of a firearm intended for recreational use only. *See* U.S.S.G. § 2K2.1, comment. (n.2) ("[S]ome rifles or shotguns may be possessed for criminal purposes, while some handguns may be suitable for recreation. Therefore, the guideline is not based upon the type of weapon."); *see also id.* § 2K2.1(b)(1) (citing recreational intent as mitigating sentencing factor).

Thus, the omission of a specific offense characteristic relating to "weapon type" falls far short of a categorical prohibition. Accordingly, to the extent a sentencing court supportably finds that a defendant's choice of weapons, *and the actual manner of its use,* increased the danger to "unusual" levels, an upward departure under U.S.S.G. § 5K2.6

---

**9.** Even though the disjunctive employed in § 5K2.6 (*i.e.,* "used or possessed") might be read to apply to offenses of conviction which would not contemplate that the defendant have possessed or used any firearm at all, its plain language would encompass a firearm possession offense where defendant not only passively possessed the firearm, but also used (*i.e.,* discharged or recklessly discarded) it in an exceptionally dangerous manner.

would be permissible. *See* U.S.S.G. Ch. 1, Pt. A, intro. comment.(4)(b); *see also, e.g., United States v. Lebon,* 800 F.Supp. 1012, 1017 (D.Mass.1992) (departure warranted for defendant's use of semiautomatic weapons).

### 2. *Existence Vel Non of Departure Criteria*

We next inquire whether the record facts adequately support each departure criterion relied upon by the district court. *DeMasi,* 40 F.3d at 1322; *see supra* Section I.D. Hardy directly challenges the sentencing court's reliance on: (i) the determination that CHC III would not adequately reflect either the seriousness of Hardy's criminal history or the likelihood of recidivism, *see* U.S.S.G. § 4A1.3; and (ii) three "unusual" offense-related characteristics of the Lenox Street shooting incident, *see id.* § 5K2.0, specifically that Hardy's firearm/ammunition possession on April 18, 1991, facilitated his ongoing participation in gang-related activities; the Lenox Street shooting occurred in a crowded, low-income neighborhood particularly vulnerable to crime; and the unusual level of risk created by the number and types of firearms, as well as the manner of their use in the Lenox Street shooting.

■ Substantial deference is due a sentencing court's assessment that the cumulative circumstances are unusual enough to implicate a departure criterion, thereby removing the case from the "heartland":

> [T]he district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing. Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guidelines cases. District courts have an institutional advantage over appel-

late courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do.... "To ignore the district court's special competence—about the 'ordinariness' or 'unusualness' of a particular case—would risk depriving the Sentencing Commission of an important source of information, namely, the reactions of the trial judge to the fact-specific circumstances of the case...."

*Koon,* —— U.S. at —— – ——, 116 S.Ct. at 2046–47 (quoting *United States v. Rivera,* 994 F.2d 942, 951 (1st Cir.1993) (Breyer, C.J.)) (other citations omitted).

### a) *Uncounted Past Criminal Conduct (§ 4A1.3)*

■ Hardy challenges the district court's finding, by a preponderance of the evidence, that he committed the criminal conduct underlying the two assault and battery convictions vacated by the state court following his first trial. *See supra* note 3. He uninformatively contends that the only reason he did not claim actual innocence of these charges when he returned to state court was that his motions to vacate focused exclusively on the procedural infirmities at trial. Second, he contends that the district court's recidivism ruling is not supported by the record. He points out that he is no longer a young adult (*i.e.,* in his early twenties or younger), thus not within the statistical class of criminal defendants most prone to recidivism, *see* U.S.S.G. § 4A1.3, backg'd; *United States v. Fahm,* 13 F.3d 447, 450 (1st Cir. 1994), and further that his street gang disbanded after repeated federal prosecutions. These arguments fundamentally misapprehend the departure rationale relied on by the district court.

Section 4A1.3 specifically encourages upward departures based on "reliable information" that a defendant previously engaged in "prior similar adult criminal conduct not resulting in a conviction," U.S.S.G. § 4A1.3(e),[10] which plainly encompasses charged conduct

---

**10.** Without citation to authority or developed argumentation, Hardy contends that the quoted language should only apply to charges no longer pending against a defendant (*i.e.,* not subject to possible retrial), and that a defendant need ob-

ject to a PSR description of "prior similar adult criminal conduct not resulting in a conviction" only if the PSR states that the defendant engaged in the criminal activity, and not merely that the police so reported. We have been no more suc-

underlying vacated convictions. *See, e.g., United States v. Guthrie*, 931 F.2d 564, 572–73 (9th Cir.1991) (noting that vacated convictions may be considered under § 4A1.3); *accord, e.g., Fahm*, 13 F.3d at 451 n. 3 (affirming use of uncharged and unadjudicated criminal conduct as bases for upward departures). As the trier .of fact at sentencing, therefore, the district court was permitted to credit reliable evidence that Hardy committed the criminal conduct underlying the two assault-and-battery convictions vacated during these proceedings, *see United States v. Figaro*, 935 F.2d 4, 8 (1st Cir.1991) (sentencing court " 'enjoys wide discretion in determining both the relevance and reliability of sentencing information' ") (citation omitted). The unchallenged statement in the revised PSR—that Hardy kicked his girlfriend in the head and upper body with his shod foot, punched her in the head, and threw her over a third-floor balcony, *see supra* note 3, afforded a competent · basis for the district ·court's finding. Whether or not Hardy should have asserted his actual innocence upon returning to state court, he concedes that he has never denied or objected to the description in the revised PSR of the two violent assaults underlying the vacated convictions, *see United States v. Rosales*, 19 F.3d 763, 770 (1st Cir.1994) (court may credit, as true and accurate, PSR's unchallenged description of past criminal conduct); *Figaro*, 935 F.2d at 8. Nor does Hardy allude on appeal to any exculpatory evidence relating to the vacated convictions.·

The second claim fares no better, for it would have us disregard not only the two vacated convictions but also the cumulative evidence upon which· the district court relied in determining that Level 18, CHC III, underrepresented the seriousness of Hardy's past conduct and the· likelihood of recidivism. Between 1987 and 1989, ·Hardy was arrested four times for assaults and/or kidnapping, involving violent attacks in which he variously used his hands and feet, a rock, a stick, a

bottle, and a knife against his victims. *See* U.S.S.G. § 4A1.3(e).· At the time of the offense of conviction, Hardy not only was on probation in. connection with a prior drug conviction, but also on bail pending charges (assault with intent to murder and firearms possession) in connection with his and Moreno's shooting of Kenneth Walker. *See id.* § 4A1.3 (departure· factors may include whether offense of conviction was committed "while on bail or pretrial release for another serious offense"); *United States v. Diaz–Martinez*, 71 F.3d 946, 952 (1st Cir.1995).[11] The Walker shooting occurred. in the Lenox Street Housing Development a mere month prior to the offense of conviction. *See Figaro*, 935 F.2d at 7 ("[R]ecency of a prior offense may be considered an indicator of increased likelihood of recidivism, exacerbating the seriousness of a defendant's criminal history."). Given his recent, persistent, and escalating record of violent behavior, *see United States v. Doe*, 18 F.3d 41, 47 (1st Cir.1994) (noting that departure was warranted where defendant's past criminal conduct demonstrated "significantly unusual penchant for serious criminality"), we find no abuse of discretion in the district court's decision that an upward departure was warranted because Hardy's pre-departure CHC underrepresented the seriousness of his past criminal conduct and the likelihood of recidivism. *See Koon*, —— U.S. at —— – ——, 116 S.Ct. at 2046–47 (holding that district court is entitled ·to "substantial deference" in its determination that particular facts of case implicate a departure factor).

**b)** *Offense–Related Characteristics (§ 5K2.0)*

■ Similarly, we find little merit in the claim that the sentencing court abused its discretion in finding three "unusual" offense-related characteristics cumulatively adequate to remove Hardy's case from the "heartland" of section 2K2.1 cases. Given their recognized utility and ubiquity in a very

cessful than Hardy in finding support for either of these conclusory contentions. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.) (invoking "the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

Nor do we discern a sound basis in reason or · common sense.

**11.** As the government aptly notes, Hardy was under some sort of court supervision at the time of almost all his prior arrests.

broad spectrum of criminal activities, firearms presumably may be possessed in circumstances posing widely divergent degrees of dangerousness. Accordingly, it is not apparent to us that the Sentencing Commission attempted, let alone managed, to devise section 2K2.1 with a view to the extraordinary dangers posed by gang members indiscriminately shooting and discarding particularly dangerous firearms in crowded inner-city residential areas.[12]

Hardy and his associates repeatedly discharged a semi-automatic weapon at nighttime within a crowded residential housing development and, while fleeing from the scene to evade arrest, Hardy planted a loaded sawed-off shotgun *barrel-up* in the backyard of a residence where children lived and played. Without deciding whether it would suffice as an *independent* ground for departure, we think the district court, in these egregious circumstances, did not abuse its discretion by concluding that crowded, low-income, inner-city neighborhoods are likely as a rule to be more vulnerable to the hazards posed by such reckless and indiscriminate criminal uses of firearms.

Lastly, the record includes affidavits from law enforcement officers describing Hardy's, and his associates', lengthy affiliation with the Columbia Point Dogs, a Boston street gang with a conspicuous history of inter-gang violence and illicit drug distribution in the Lenox Street area. The record further supports the conclusion that on April 18, 1991, Hardy and his associates possessed the semi-automatic weapons and sawed-off shotgun for the purpose of facilitating their gang's ongoing terrorization of the Lenox Street neighborhood in furtherance of its drug distribution operations. *See, e.g., United States v. Sweeting,* 933 F.2d 962, 966–67 (11th Cir. 1991) (affirming defendant's ongoing connection to street gang as appropriate ground for departure); *accord United States v. Thomas,* 906 F.2d 323, 328 (7th Cir.1990). Accordingly, we find no manifest abuse of discretion by

the district court. *See Koon,* —— U.S. at —— – ——, 116 S.Ct. at 2046–47.

### 3. *Reasonableness of Degree of Departure*

Finally, Hardy argues that the section 4A1.3 departure was unreasonable in degree as a matter of law, because the district court proceeded directly from Level 18, CHC III, to Level 18, CHC VI, without either considering or explaining why the sentencing range prescribed at CHC IV or CHC V was inadequate to reflect the seriousness of his past conduct or the likelihood of recidivism. *See United States v. Tropiano,* 50 F.3d 157, 162 (2d Cir.1995); *supra* Section II.B.1 (contrasting "unguided" and "guided" departures). He further argues that section 4A1.3 rarely permits a sentencing court to depart beyond the sentencing range prescribed by CHC VI based on an "egregious" past criminal record, and, as such, it constitutes a "discouraged" ground for departure.

We need not reach either of these arguments, since the departure decision was not founded on section 4A1.3 alone, *cf., e.g., Fahm,* 13 F.3d at 450 & n. 2 (involving departure based exclusively on § 4A1.3 criteria), but on both sections 4A1.3 and 5K2.0. *See United States v. Aymelek,* 926 F.2d 64, 69–70 (1st Cir.1991) (noting that §§ 5K2.0 and 4A1.3 need not be an " 'either/or' proposition," and that both may be used to support a single departure decision). The district court relied in part on some offense-related attributes (*e.g.,* number and dangerousness of weapons) independently sufficient to justify an unguided vertical departure under section 5K2.0. In determining such "mixed" departures, no useful purpose is served by insisting that the sentencing court adhere to all section 4A1.3 formalities, only to countenance its "unguided" discretion to make an "appropriate" non-horizontal departure under section 5K2.0. *See Figaro,* 935 F.2d at 8–9 (rejecting "leap-frogging" argument in "mixed" §§ 4A1.3–5K2.0 case).

---

**12.** Hardy argues that street gangs are such a "fact of life" in the inner city that the Commission could not but have anticipated that a large percentage of criminal defendants would be street gang members. Of course, the focus of the "heartland" inquiry is not nearly so broad. Instead, sentencing courts are to inquire whether one reasonably would expect an unusual number of defendants convicted of firearm/ammunition possession to be gang members. *See, e.g., Koon,* —— U.S. at ——, 116 S.Ct. at 2052 (rejecting "career loss" as downward departure criterion for purposes of § 2H1.4, since it is not "unusual" for many public officials convicted of civil rights violations to lose their jobs).

Finally, Hardy's protestations notwithstanding, we cannot conclude that the degree of departure was unreasonable. *See DeMasi,* 40 F.3d at 1322. A sentencing court is not required to "dissect its departure decision, explaining in mathematical or pseudo-mathematical terms each microscopic choice made." *United States v. Rostoff,* 53 F.3d 398, 408 (1st Cir.1995). Similarly, the reasonableness *vel non* of the degree of departure need "not [ ] be determined by rigid adherence to a particular mechanistic formula, but by an evaluation of 'the overall aggregate of known circumstances.' " *Figaro,* 935 F.2d at 9 n. 2 (citations omitted). While the departure in this case is indeed substantial (300%), we have affirmed larger ones. *See Rostoff,* 53 F.3d at 411 (collecting cases affirming upward departures ranging from 165 to 380 percent). Further, the district court "checked" the degree of its departure by calculating the hypothetical sentence Hardy would have received had he been sentenced under the November 1994 guidelines (121–151 months), on the theory that the Commission had since incorporated many of the offense-related characteristics that formed the bases for the district court's decision to depart in this case.[13] Given Hardy's persistent ten-year history of violent anti-social behavior, as well as the dangerousness of his conduct on April 18, 1991, in possessing and abandoning a particularly dangerous firearm in a residential neighborhood, we cannot say that the degree of the departure imposed by the district court was not "appropriate" in the circumstances.

### III

### CONCLUSION

For the foregoing reasons, the district court judgment is *affirmed.*

---

**13.** Hardy argues that the district court erred in this regard. The government concedes that the court incorrectly enhanced the hypothetical offense level two levels by relying on the fact that one of Hardy's weapons had an obliterated serial number. Thus, the correct hypothetical total offense level should have been 30, not 32. The error was harmless, however, since the court also assigned Hardy a CHC I, Level 32, rather than CHC III, Level 30. Both prescribe a sentencing range of 121–151 months.